ROBERT L. LEACH, State Superintendent of Banking, Appellant,
v. FARMERS SAVINGS BANK OF HAMBURG et al., Appellees.

MUNICIPAL CORPORATIONS: Fiscal Management—Wrongful De-
1 posits. Deposits by a city treasurer of city funds in a bank are
wrongful and title to such deposits does not pass to the bank when
the city council had simply "designated" the bank as a city de-
pository, without specifying the amount of deposits authorized and
without requiring or receiving any bond, as required by statute.
(Sec. 5651, Code of 1927.)

BANKS AND BANKING: Trust Funds—Charging and Crediting
2 Accounts—Augmentation of Assets. The act of a bank which is
the common depositary of both the drawer and the payee of a
check in charging the amount of the check to the account of the
drawer and in crediting the same amount to the account of the
payee constitutes an augmentation of the assets of the bank.

TRUSTS: Preservation—Presumption. Trust funds in the form of
3 cash are presumptively preserved in the cash balance which passed
into the hands of the receiver for the insolvent trustee.

MORLING, J., dissents generally.

Headnote 1: 18 C. J. pp. 584, 585.   Headnote 2: 7 C. J. p. 751.
Headnote 3: 7 C. J. p. 752.

Headnote 1: 3 R. C. L. 555, 556.   Headnote 3: 3 R. C. L. 554.

*Appeal from Fremont District Court.*—J. S. DEWELL, Judge.

DECEMBER 13, 1927.

The city of Hamburg filed a claim against the receiver of
the Farmers Savings Bank of Hamburg, asking a preference,
which was allowed. The receiver appeals.—*Modified and
affirmed.*

*Ben J. Gibson,* Attorney-general, and *W. E. Mitchell,* for
appellant.

*Thornell, Thornell & Adams* and *Hickman & Hoyne,* for
appellee.

ALBERT, J.—The Farmers Savings Bank of Hamburg was

a corporation organized under the laws of the state of Iowa for the transaction of a banking business. It closed its doors on December 20, 1924. The superintendent of banking of this state took possession, and on January 8, 1925, was appointed receiver. C. B. Clayton was vice president of said bank, and had also, for a number of years prior thereto, been treasurer of the city of Hamburg, and kept his funds as such treasurer on deposit in said bank. The city of Hamburg, through its council, did not designate this bank as a depository for the city funds until October 21, 1924, if it did then. The bank never at any time made the statutory bond requisite to becoming a depository. The last deposit of city funds was made on October 25, 1924. The amount then deposited was $7,038.44. Many deposits had been made by this treasurer prior to this time, and they were all in an open account, and much money had been checked out at various times. The balance shown to be due the city at the time the bank closed was $16,441.78. Cash on hand, at the date of closing, and in other depositories, was $11,919.35. It is claimed that, at the time this last deposit was made, the city council had approved this bank as a depository, but the treasurer did not know that the council had so done until after this deposit was made.

1. MUNICIPAL CORPORATIONS: fiscal management: wrongful deposits.

It is admitted that the city of Hamburg is a city of the second class. The law in force at the time these deposits were made was Section 660-a, Code Supplement, 1913. Under this section the city council is required to do two things: It is required to designate the bank and the amount to be deposited. The statute further requires that, before such deposit is made, the depository is required to file bond in double the amount deposited, with sureties to be approved by the treasurer and the city council, which bond is to be filed with the city clerk. An investigation of the records of the city council shows only the following entry:

"That the Farmers Savings Bank of Hamburg, Iowa, be designated as a depository of the city of Hamburg, in accordance with Section 5651, Supplement 1919, and House File 154 of the Acts of the Fortieth General Assembly."

These citations are erroneous, and evidently refer to the aforesaid Section 660-a, Code Supplement, 1913. This section

of the statute is prohibitive in its force and effect. In other words, a city treasurer has no right to deposit money in a bank unless the provisions of the aforesaid section have been complied with. It is apparent from the above record of the city council that the section has not been complied with in two respects. While it does designate this bank as a depository, it does not specify the amount to be deposited, nor was there any bond given, as required by this section. It must follow, therefore, that the deposits made by the city treasurer were wrongful. We have so held as to failure to give bond in the case of *City of New Hampton v. Leach,* 201 Iowa 316. The deposits being thus wrongful in the first instance, title never passed to the bank, and it held said fund as a trust fund. We said further in the *New Hampton* case:

"If a trust fund is established, a presumption arises that it was retained in the possession of the trustee and came into the hands of the receiver, and the burden is upon the receiver to overcome this presumption."

This conclusion was based on our previous holdings, which are cited in the *New Hampton* case.

If this were all that is involved in this case, we might well end the opinion here by an affirmance, on the strength of our former holdings in *Independent Dist. v. King,* 80 Iowa 497; *Davenport Plow Co. v. Lamp,* 80 Iowa 722; *In re Assignment of Knapp & Co.,* 101 Iowa 488; *Smith v. Des Moines Nat. Bank,* 107 Iowa 620; *Page County v. Rose,* 130 Iowa 296; *Brown v. Sheldon St. Bank,* 139 Iowa 83; *Leach v. Exchange St. Bank,* 200 Iowa 185.

But the record in this case shows that the deposits made by the city treasurer largely consisted of taxes collected by the county treasurer in behalf of the city, and the method of payment by the county treasurer to the city treasurer was as follows: The county treasurer carried his deposit with this same bank. When he had collected taxes for the city and wished to turn them over, he drew his check, as county treasurer, payable to the city treasurer, and delivered this check to the city treasurer. The city treasurer then presented the same to the bank, and the bank charged the check to the county treasurer, and credited the city treasurer's account with

2. BANKS AND BANKING: trust funds: charging and crediting accounts: augmentation of assets.

an equal amount. It is seriously urged that this process of transferring funds did not increase the assets of the bank, and to this question we will give our attention.

We assume that no one would dispute the proposition that, if the city treasurer presented the county treasurer's check to the bank, properly indorsed, and the bank paid him the face of the check in cash over the counter, and then he passed the cash back to the bank, and asked to have it credited to his account as city treasurer, this in fact increased the assets of the bank. In its legal effect, is this not exactly what was done in the case at bar?

In *Messenger v. Carroll Tr. & Sav. Bank*, 193 Iowa 608, the bank held a sight draft on one Swaney, who was a depositor of the bank, drawn in favor of the Moline Plow Company. It presented the sight draft to Swaney, who paid the same by giving the bank his check for the amount thereof, drawn on the same bank that presented the sight draft, in which bank he was a depositor. The bank charged the check to Swaney's account, and forwarded to the Moline Plow Company its draft drawn on Chicago, which was dishonored because the Carroll Bank closed before the draft was presented in Chicago. In that case we said:

"That this method of collection was the full equivalent of the payment of money by the Swaney Company, and served to the augmentation of the assets of the bank in precisely the same manner as the delivery of currency would have done, is held in the following authorities: [citing numerous cases]. We deem it clear that the net result of the transaction of payment by the Swaney Company and the receipt thereof by the collecting bank was the same as though the Swaney Company had drawn the currency into its own hands by means of check, and had thereupon delivered the same to the collecting bank in payment of the sight draft."

In *Union St. Bank v. Peoples St. Bank*, 192 Wis. 28 (211 N. W. 931, at 933), the Wisconsin Supreme Court, having this question before it, made the following pronouncement:

"This court has already adopted the doctrine that the deposit to the credit of the customer at the counter of the bank of one of its own checks is the exact equivalent, in legal view, to the bank passing to its customer the cash and the

passing of the cash back for deposit and credit.  It was so held in *Ellis v. State,* 138 Wis. 513, 531, 119 N. W. 1110, and so held as to the bank's own certificate of deposit in *State v. Shove,* 96 Wis. 1, 9, 70 N. W. 312. * * * The same rule is recognized elsewhere.  *Hawaiian Pineapple Co. v. Browne,* 69 Mont. 140, 220 Pac. 1114; *Goodyear T. & R. Co. v. Hanover State Bank,* 109 Kans. 772, 204 Pac. 992; *Kesl v. Hanover State Bank,* 109 Kan. 776, 204 Pac. 994; *Northwestern L. Co. v. Scandinavian Am. Bank,* 130 Wash. 33, 225 Pac. 825; *State Nat. Bank v. First Nat. Bank,* 124 Ark. 531, 187 S. W. 673.''

In *Northwest Lbr. Co. v. Scandinavian Am. Bank,* 130 Wash. 33 (225 Pac. 825), the Washington court had before it a case in which the plaintiff had outstanding obligations.  The lumber company forwarded to the bank its check for $5,200, on June 24, 1921, to meet these obligations, which were due July 1st.  The check was not paid or canceled, nor was the amount thereof charged to the lumber company's account.  The lumber company at all times had an amount in its deposit account in excess of the amount of this check.  On June 30, 1921, the bank was taken over by the state supervisor of banking, who proceeded to liquidate the same.  The lumber company filed claim for preference.  In that case it is said:

''As a final reason against a recovery it is urged that there was by the transaction no augmentation of the assets of the bank.  The fact here assumed is undoubtedly true, as applied to the general assets of the bank: that is to say, it is true in the sense that the bank held no greater assets at the completion of the transaction than it held at its beginning.  But it is not our understanding that this is the principle upon which the doctrine of augmentation rests.  The equitable right to follow misapplied property into the hands of the parties receiving it depends upon the ability of identifying it in specie, or the ability of identifying the property with which it has been confused, or into which it has been converted.  If this cannot be done, there can be no recovery, even though it be shown that the general assets of the estate have been increased to the amount and value of the property.  The rule as applied to money which has been intermingled with other money thus means that it must be shown that the mass of money from which it must be taken has been increased by the amount of money which has

been misapplied,—not that it must be shown that the general assets of the possessor of the money have been increased. In the instant case, there is a showing that the money which came into the hands of the supervisor on the insolvency of the bank was greater by the amount of the check than it would have been, had the bank performed its duty and made the actual segregation, and in consequence, an augmentation of that mass.''

As supporting this doctrine, that court cites *People v. City Bank of Rochester,* 96 N. Y. 32; *Dows v. Kidder,* 84 N. Y. 121; *State v. Grills,* 35 R. I. 70 (85 Atl. 281); *Stoller v. Coates,* 88 Mo. 514; *Goodyear T. & R. Co. v. Hanover St. Bank,* 109 Kan. 772 (204 Pac. 992).

Without delving further into the many cases of this court and other courts on this question of preference, we will say that there seems to be an underlying principle which is present in

3. TRUSTS: pres-
    ervation: pre-
    sumption.

all cases of this character: that is, that a preference can only exist where the title to the property has not passed. In other words, he who seeks to claim preference must be able to point out certain specific property, and say, "That is my property, because I have a title thereto;" or, in case the property has been commingled so that he is unable to point out his identical property, if he yet can say and show that in the mass of property "my property exists," although incapable of specific identification, he is entitled to reclaim it. It is not in fact a question of preference or superior right over other claimants, but it is a simple proposition of recovery of property to which he holds title.

The evidence in the instant case shows that, at the various times these deposits were made by the city treasurer, as above explained, there was at all times in the vaults of the bank money far in excess of the amount of deposits thus made. When the city treasurer presented the county treasurer's check on these funds, it is therefore apparent that, had he requested cash on the county treasurer's check, there was actual money in the bank far in excess of that necessary to meet the check. The law does not require the doing of idle things. Under our holdings, the deposit made by the city treasurer was unlawful and wrongful; and, in line with our holding in the *Messenger* case and the cases above cited, we hold that, in legal effect,

under the circumstances in this case, the net result was identically the same as though he had drawn the money on the check in actual cash, and then returned it to the bank for credit to his account as city treasurer. When the bank received the check and charged it to the county treasurer's account, it, in effect, withdrew that amount from his account and paid it to the city treasurer. The city treasurer then redeposited the same to his own credit, and we have held that this deposit by him was unlawful. However, the funds were commingled with the funds of the bank, and, of course, lost their identity. The deposit being wrongful, the title thereto never passed to the bank, and it therefore follows that the claimant was entitled to recover his property from the common mass. The record shows that, before this bank closed, the mass of its cash assets had been reduced to $11,919.35. This being less than the balance the city treasurer had on deposit, it follows that the excess over and above the cash on hand at the time the bank closed had been dissipated.

Further than this, the evidence in the case shows that there are two other claims on which preference is made; and while we hold that the city has traced its funds into a common mass sufficiently to answer the call of the law under such circumstances, and that it is entitled to recover its funds, it must be limited to the funds on hand at the time the bank closed. There is a further limitation also on the right to recover from this common fund, by reason of the fact of the existence of the two other claims for preference, which, if allowed, must share in this common fund. The district court established this claim as a preferred claim, and ordered it paid in full, provided there were sufficient funds in the hands of the receiver; and if not, then the preferred creditors should share *pro rata* in such fund. This order is too broad, because the fund from which the preferred creditors are to be paid is limited to $11,919.35. The order should be modified accordingly.—*Modified and affirmed.*

EVANS, C. J., and FAVILLE, DE GRAFF, KINDIG, and WAGNER, JJ., concur.

STEVENS, J., not participating.

MORLING, J., dissents.

MORLING, J. (dissenting). A so-called claim for preference such as this is merely one for the establishment of claimant's ownership of property in the possession of the receiver, and a demand for decree for its restitution to claimant. Claimant is not entitled to be preferred in the payment of a liability incurred by the insolvent for the loss of claimant's property. Claimant, to establish his right, must show: (1) The existence of some concrete fund or article or item of property (2) of which the claimant is the owner *(Farnsworth v. Muscatine P. & P. I. Co.,* 177 Iowa 21, 30), (3) of such nature that its receipt by the bank would augment the assets in its possession *(Brooke v. King,* 104 Iowa 713). (4) He must show that his property did come into the possession of the bank (5) under such circumstances that he did not lose, and the bank did not acquire, title to it. (6) It must appear that "the fund has increased the present assets of the bank, and (7) that it may be taken therefrom without impairment of the rights of creditors." *First St. Bank v. Oelke,* 149 Iowa 662, 667.

The existence of a fund or other item of property belonging to the claimant and capable of augmenting the assets in the possession of the bank is not shown. The county treasurer was a depositor in the defendant bank. There is no suggestion that the deposits by the county treasurer were unauthorized or wrongful. As rightdoing, not wrongdoing, is presumed, it must be presumed that the deposits to the county treasurer's account were rightful; that the title to the funds deposited by him had passed to the bank; and that the relationship between the bank and the county treasurer was that of debtor and creditor. The state of the county treasurer's account at no time is shown. For all that appears, it may have been, at the times under consideration, overdrawn; but, if we assume that there were in the account credit balances equal in amount to the checks drawn in favor of the city treasurer, the fact remains that the bank was merely indebted to the county treasurer to the amount of such credit balances, and that the checks at most operated, to the extent of the amount thereof, to substitute the city treasurer as the creditor of the bank, in place of the county treasurer. The result was merely that the city treasurer became the creditor of the bank to the amount of the check. The parties intended no differently; for the testimony of the city

treasurer, who was vice president of the bank, is that this (so-called) money was put into the bank with the balance of the bank's funds, and treated the same as the money of any depositor. This was known by the city council. The mayor received the vouchers from the county treasurer and delivered them to the city treasurer. The council made settlements with the city treasurer, and always took the checks and figured them up. Interest was allowed and credited on the balances. The assets of the bank were not increased a penny by the county treasurer's checks. *Messenger v. Carroll Tr. & Sav. Bank,* 193 Iowa 608, is at this point made the scapegoat to bear into the wilderness the iniquity of taking the bank's money, which, on insolvency, the law gives to depositors generally, and giving it to one of them. In that case the claimant to a preference was neither in fact nor ostensibly a depositor or creditor of the defendant bank. The claimant there drew a sight draft upon a customer of the bank, with a bill of lading attached, and sent it to the bank, with directions to collect and remit. The amount was $1,411.98. The bank was instructed to surrender the bill of lading only on payment of the draft and charges, and to remit the full amount of the draft to claimant. The bank had not less than $15,000 in cash on hand up to the time of suspension, and not less than $10,000 passed into the hands of the receiver. The customer had on deposit in the same bank $4,500. The customer drew his check against this deposit. The check was charged to his account, and the amount put into the form of Chicago exchange, and thus remitted. The transaction in that case, therefore, was the ordinary one where a bank in full operation receives a collection against a depositor and accepts for the collection the depositor's check upon his deposit of a much larger amount. The bank actually had a considerable cash reserve. It received the sight draft as agent for collection from a non-depositor, in the regular course of business, and it undertook to represent the drawer, in whose interest alone by the assumption of the agency it was bound to act. Under the evidence there, the actual cash would, in the regular routine of the business, if demanded, have been drawn out and paid. The bank was authorized to make collection only in cash. The check was charged to the depositor's account. The proceeds, assumed to be from funds which it in fact had on hand, were

held as agent. · The bank actually had the money with which to pay without embarrassment. It assumed, not an implied relationship, but the express relationship of agent for that money. There was nothing to suggest collusion or fraud. The case was a very different one from a mere formal transfer of credit by means of check from one depositor to another,—a changing from what must be assumed to have been a lawful deposit, to an unlawful one, by a failing bank, to the prejudice of the other general depositors. There was nothing in the transaction in the *Messenger* case out of the ordinary, and nothing to impugn it as a usual one in the regular course of business of a going bank. The evidence in the case here shows that the defendant bank, at the time of the transactions under review, and for a long time anterior thereto, was tottering to its fall. As has been said, there is no evidence of the state of the county treasurer's account. As is well known, credits to such accounts consist largely of the tax receipts of customers, charged to the customers, or perhaps carried, in some cases, in the cash items. That the bank permitted overdrafts is shown by the item of overdrafts of upwards of $9,000 reported by the receiver. There is no evidence of the amount of cash on hand in the bank at any time, except that, when the bank closed, it had cash, as shown by the inventory, to the amount of $6,316.61, and "cash items" $1,677.93, the nature of which is not shown. There is no evidence whatever of the amount of cash on hand at the time of the giving of the county treasurer's checks, or at any other time than December 19, 1924, the date of closing. The record does show the total of "money in banks, including cash," daily for many months, but does not separate the cash from the bank balances. That the bank balances were subject to offset by reason of indebtedness on loans and rediscounts with the depositary banks is a fair inference, not only from the condition of the bank, but from the evidence that, at the date of closing, the total amount of the bank balances was $11,919.35; and these were subject to offsets claimed in the depositary banks, amounting to $6,137.31, besides unadjusted rediscounts of $11,000. The total amount of deposits, and therefore the amount of reserve required, is not shown, except that, at the time of closing, the deposits amounted to $62,347.55 and the commercial deposits to $261,274.03,—requiring, under the stat-

ute, a reserve of not less than $44,000. The reserve is shown to have been subject to great fluctuations. The amount of cash and deposits in banks was, on April 2, 1921, $34,959.02; on April 4, 1921, $27,839.82; on April 22, 1921, $20,722.38; on May 12, 1921, $17,449.81,—at no time until July 21, 1921, amounting to $44,000. It shows on February 28, 1923, a total of $29,629.39; on July 13, 1923, $26,629.39; on December 29, 1923, $22,551.36; on January 5, 1924, $20,156.90; on February 26, 1924, $17,851.40; on August 29, 1924, $13,391.74; on November 18, 1924, $14,818.44. The extent and manner of the doing of the business of the bank at the dates of the county treasurer's checks, and whether or not the bank was paying or would pay all checks as presented, and the extent of its ability to pay its depositors, are not shown.

On July 18, 1924, the directors put into the bank their notes aggregating $25,000, and took out excess loans to that amount. On November 25, 1924, they put in $39,000 in cash, and took out an equivalent amount in the notes of themselves and others. There was paid out in 1924 $3,348,386.18. The examiner in charge estimated that there would be a deficiency of $100,000 in paying deposits.

The city treasurer would have no authority to accept in payment of taxes collected by the county treasurer drafts on bank correspondents' accounts. On this record, it would be fallacious to hold as a proved fact that if, on April 24, 1924,—even though, on that date, as the evidence shows, the "amount of money in various banks, including cash on hand," was $57,490.97,—the vice president of the bank, as city treasurer, had presented to himself, as vice president of the bank, the county treasurer's check for $7,608.09, it would have been in good faith paid in cash over the counter, and would have been taken out of the bank, and that the acceptance and deposit of the check were equivalent to the receipt and redeposit of the cash. Equally without foundation would it be to hold that, on October 25, 1924, though the "amount of money in various banks, including cash," was then $31,676.09, a like process would have resulted in the taking out by the vice president of the bank, as city treasurer, of the cash for $6,276.67. The condition of the bank and the well known history of banks in similar condition during the last few years tell us that an in-

sistence upon the withdrawal of public funds or the payment of such amounts in cash for the purpose of actual withdrawal would have resulted in closing the doors. That the vice president of such a bank, acting as city treasurer, would withdraw the money, or had any intention of paying the checks in money, or performing any act equivalent thereto, is phantasmic.

It is a fiction, therefore, to say that, on April 25, 1924, the city had $7,608.09, or even a fraction of it, in the form of concrete property, capable of increasing the assets in the hands of the bank, and that it came into the possession of the bank to the augmentation of such assets. It is a fiction to say that the assets in the possession of the bank were augmented thereby, a fiction to hold that the city's property came into the possession of the receiver, and impossible to say "that the fund or some part thereof still exists in some tangible form in the receiver's hands" (*Hudspeth v. Union Tr. & Sav. Bank*, 197 Iowa 913), or that such sum, or any fraction of it, upon this record, "has increased the present assets of the bank, and that it may be taken therefrom without impairment of the rights of creditors." *First St. Bank v. Oelke*, 149 Iowa 662, 667. These observations apply even more emphatically to the credit of October 25, 1924, $6,276.67, entered six months nearer to, and less than two months before, final closing, and one month before the directors put in $39,000 in cash. The law gives the right of preference to depositors. At the risk of repeating, the county had not money, but a credit, in the bank. The city treasurer took, not money, but a check. He did not intend, as the city treasurer, to demand, or as the officer of the bank, to pay, cash on the check; for the evidence is positive that the city deposits were taken the same as other deposits. Though it was not intended to demand or pay cash, the majority opinion imputes such intention, contrary to the fact, and presumes a presentment of the check by the city treasurer to himself, as vice president, the receipt of the cash, and the redeposit of it; and this, not only in flat contradiction of the evidence of what the purpose was, but without any evidence that cash could be paid, and in the face of convincing circumstantial evidence that it would not have been paid. Upon these fictions the majority opinion builds another fiction, that the assets in the hands of the bank were increased. On these is pyramided the further

fiction that cash belonging to the city was held by the bank in the capacity of trustee, and retained in its possession while it was making payments in the millions. On these fictions is erected the next one, that this money "has increased the present assets of the bank, and that it may be taken therefrom without impairment of the rights of creditors." It is no answer to say that the city treasurer had no authority to receive in payment of the city taxes anything but cash or its equivalent. He did take a transfer of credit only. Therefore he did not receive payment. "It is a condition, and not a theory, that confronts us here." The county must be assumed to have taken a bond for the payment of its deposits. According to the evidence of actual intention, and what was actually done, the city treasurer did not receive payment of the taxes collected by the treasurer. The consequences of the misfeasance of the city's officers ought not to be visited on the depositors. The transfer of credit from the county treasurer's account to the city treasurer's account on the books of the bank was made with no purpose of giving the city greater rights than the county had, or of changing the bank's relationship to the fund from that of creditor to that of trustee. It is a wrong to the depositors to impute such an intention.

A bank failure works great hardships to all classes of depositors. Though their legal relationship to the bank is that of debtor and creditor, yet in popular estimation, in making the deposits and in consequences to them, depositors put their money in the bank in the belief that it is to be returned to them on demand, or at the time stipulated therefor. The savings of the aged and the poor, the living of the widow and orphan, are there. These suffer cruel distress when the bank fails. To allay the sufferings of depositors as far as practicable, the law gives them a right of preference in the distribution of the property belonging to the bank. The law is humane, and its beneficent provisions ought not to be diminished or defeated by the acceptance of presumptions unfounded in experience, or so fanciful as to be mere fictions. The property in question here (barring fictions) does belong to the bank. The contest here is with depositors. *Stilson v. First St. Bank,* 152 Iowa 724, 730. We have been receding from fundamental principles, and from our precedents recognizing facts, such as

*Brooke v. King,* 104 Iowa 713; *Jewell v. Clay,* 107 Iowa 52, 56; *Bradley v. Chesebrough,* 111 Iowa 126; *First St. Bank v. Oelke,* 149 Iowa 662; *Farnsworth v. Muscatine P. & P. I. Co.,* 177 Iowa 20,—drifting into fictions, until we have reached, as it seems to me, in the present case, not only a factitious, but a most unjust, result. These conclusions in general, and in particular that there was merely a change of creditors of the bank, no augmentation of its assets, and no funds of claimant traced into the hands of the receiver, are sustained by the following authorities: *People v. Merchants & Mechanics' Bank,* 78 N. Y. 269; *Citizens Bank v. Bradley,* 136 S. C. 511 (134 S. E. 510); *Zimmerli v. Northern Bank & Tr. Co.,* 111 Wash. 624 (191 Pac. 788); *Hecker-Jones-Jewell Mill. Co. v. Cosmopolitan Tr. Co.,* 242 Mass. 181 (136 N. E. 333); *Lawrence v. Lincoln County Trust Co.* (Me.), 131 Atl. 863; *Chetopa St. Bank v. Farmers & Merch. St. Bank,* 114 Kan. 463 (218 Pac. 1000); *Larabee Flour Mills v. First Nat. Bank,* 13 Fed. (2d Series) 330; *Nyssa-Arcadia Drainage Dist. v. First Nat. Bank,* 3 Fed. (2d Series) 648; *American Bank v. People's Bank* (Mo. App.), 255 S. W. 943; *Lamro St. Bank v. Farmers' St. Bank,* 34 S. D. 417 (148 N. W. 851); *Empire St. Sur. Co. v. Carroll County,* 114 C. C. A. 435 (194 Fed. 593); *Beard v. Independent Dist.,* 31 C. C. A. 562 88 Fed. 375); *Phoenix Title & Tr. Co. v. Central Bank* (Ariz.), 247 Pac. 1097.

I think the judgment should be reversed.