# COUNTY COMMISSIONERS OF FREDERICK COUNTY *v.* GEORGE W. PAGE, Bank Commissioner.

### [No. 75, October Term, 1932.]

*Decided January 18th, 1933.*

The cause was argued before BOND, C. J., ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*W. Clinton McSherry,* for the appellants.

*John S. Newman,* for the appellee.

Offutt, J., delivered the opinion of the Court.

The Central Trust Company of Maryland, herein for convenience called the trust company, a banking and trust company having its main office in Frederick City, and operating extensively throughout central and western Maryland, on September 2nd, 1931, adopted a resolution placing its affairs in the hands of George W. Page, bank commissioner of Maryland, and he, on that day, pursuant to that action, posted on the front doors of its main office and of each of its branches a notice that "This institution is in the hands of the Bank Commissioner." On the following day he filed in the Circuit Court for Frederick County, in equity, a bill of complaint reciting these facts and praying that he be appointed a receiver to take charge of and administer the affairs of the Central Trust Company, the defendant. That company on the same day, in its answer, admitted the allegations of the bill and consented to the relief prayed, and upon that record the court, on September 3rd, 1931, appointed the complainant receiver as prayed.

On October 10th, 1931, the County Commissioners of Frederick County, herein for convenience spoken of in the plural as commissioners, filed in that proceeding a petition in which they alleged that they had, on August 22nd, 1931, entered into a trust agreement with the Central Trust Company of Maryland, under which $186,000, being the proceeds of bonds sold to redeem other bonds, "was paid" to the trust company "as trustee," for the purpose of being "held in trust" to apply (a) to deposit $150,000 on October 30th, 1931, in the Citizens' National Bank of Frederick, Md., to redeem certain coupon bonds which had been called for redemption payable at that bank, and (b) to deposit on the same date $36,000 in the Fredericktown Savings Institution, of Frederick, Md., to redeem certain other bonds which had been called for redemption, payable at that institution. They further alleged that the "said trust fund" was a preferred claim under Code, art. 11, sec. 48; that the assets of the trust company exceeded all "trust department liabilities," and they prayed the court to direct the receiver to pay on October 30th, 1932,

to the Citizens' National Bank of Frederick, $150,000, and to the Fredericktown Savings Institution, $36,000. There was filed with that petition a copy of the trust agreement which, after reciting that "the County Commissioners of Frederick County have deposited in said Bank, the proceeds of sale of the Refunding Bonds of 1931, in the amount of $186,000" and the origin and purpose of said fund, provided:

That "the Central Trust Company of Maryland, does by these presents agree to hold the said sum of one hundred eighty-six thousand ($186,000.00) dollars, in trust and apply the same as follows:

"(1) To deposit the sum of one hundred fifty thousand ($150,000.00) dollars, on October 30th, 1931, in the Citizens' National Bank of Frederick, Maryland, for the purpose of redeeming the coupon bonds of Frederick County issued in pursuance of Chapter 125 of the Acts of 1910, in the amount of seventy-five thousand ($75,000.00) dollars, and the coupon bonds of Frederick County issued in pursuance of Chapter 404 of the Acts of 1912, in the total amount of seventy-five thousand ($75,000.00) dollars, and

"(2) To deposit on October 30, 1931, the sum of thirty-six thousand ($36,000.00) dollars, in the Fredericktown Savings Institution, of Frederick, Maryland, for the purpose of redeeming the coupon bonds of Frederick County, issued in pursuance of Chapter 359 of the Acts of 1914, in the amount of thirty-six thousand ($36,000.00) dollars.

"Said fund of one hundred eighty-six thousand ($186,-000.00) dollars, shall be held by the Central Trust Company of Maryland, in trust and applied at the time and places hereinabove mentioned, and for no other purpose."

On March 17th, 1932, the receiver filed an answer to that petition in which he admitted the allegations of the petition as to the origin and nature of the fund, the execution of the trust agreement, and the deposit of the fund with the trust company. He further alleged:

"That on the 25th day of May, 1931, there was deposited in the Central Trust Company of Maryland (in an interest account,

under a contract providing that the deposits shall be subject to withdrawal upon thirty days' notice), to the credit of 'County Commissioners of Frederick County, Maryland 4% refunding bond issue of 1931,' a check in the amount of..$   4,092.00

"And that on June 1st, 1931, there was deposited to the credit of said account a draft in the sum of.................. 189,259.97

"Making a total deposit of...............$193,351.97

"And that on June 10th, 1931, there was withdrawn from said deposit the sum of.................. $400.00

"And on June 12th, 1931, there was withdrawn the sum of........ 332.40

"And that on the same day there was also withdrawn the sum of.. 195.00

"And that on June 23rd, 1931, there was withdrawn the sum of.... 50.00

"Making a total of withdrawals of........     977.40

"Leaving a balance of..................$192,374.57

"And that on July 1st, 1931, said account was credited with interest to the amount of............................... 643.52

"Making a total deposit at that time......$193,018.09

"And that on August 31st, 1931, there was charged against said account.........$186,000.00

"Being a check for said amount dated August 22, 1931, payable to 'Central Trust Company of Maryland, Trustee,' presented to said Trust Company after the close of its books on Saturday, August 29th, 1931, and charged against said account on August 31st, 1931, as aforesaid.'"

He denied that the petitioner's claim was entitled to a preference under Code, art. 11, sec. 48, and asked leave to

reargue the question, which appears to have been considered by the court in some other branch of the proceedings, as to whether that provision affected any other than judicial trusts. Testimony was taken upon the issues presented by those pleadings, and, after a hearing, the court, on March 29th, 1932, dismissed the petition. The first appeal is from that order.

On April 4th, 1932, the county commissioners filed a second petition, in which they asked for a further hearing and leave to introduce additional evidence in connection with the following propositions:

"(a) That deposit of public funds in violation of the statute, in a trust company knowing them to be public funds, creates a trust.

"(b) That a trust relation being established the claim of the public officers becomes a preferred claim by virtue of section 48 of article 11 of the Annotated Code of Maryland.

"(c) That the trust relation being established the claim of the public officers, independently of section 48 of article 11 of the Annotated Code of Maryland, are entitled to priority in the distribution of the assets of the trust company, if the deposits can be traced."

On April 11th, 1932, the commissioners filed in the case a third petition in which they alleged that there were deposited in the trust company in the name of the County Commissioners of Frederick County "In trust for Self and Joint Owners, subject to the order of either, the balance at the death of either to belong to the survivor," funds dedicated to the accumulation of sinking funds and the payment of interest on past issues of authorized bonds issued by Frederick County, aggregating $144,837.07. They further alleged that by virtue of article 11, sec. 807, P. L. L. of Md. (1930) "all monies due said county from any source whatever, shall be paid to the County Treasurer," but that the county commissioners, under a "custom" followed for many years, instead of paying funds such as those described which came into their hands to the county treasurer, had deposited them in the name of the board.

Additional evidence was taken, a further hearing was had, and on April 23rd, 1932, the court ordered that "the claims of the County Commissioners of Frederick County are hereby allowed preference to the extent indicated in the aforegoing opinion with respect to the distribution of the funds, amounting to $133,912.70, of the Central Trust Company, which came into the hands of the Receiver as of the time of his appointment." The preference "indicated in the aforegoing opinion" is that "Subject to revision as to details, our conclusion is that the County Commissioners, in regard to the $186,000 and $82,531.32 accounts, are entitled to preference as to $1,000 of the receivership funds, and in regard to the accounts having balances to the total amount of $55,287.63 they have the right to be preferred, ratably with claims for uninvested balances of ordinary trust funds, in the distribution of $132,912.70 of the funds belonging to the Trust Company at the beginning of the receivership. There is no proof identifying the deposits of the County Commissioners with any assets of the Trust Company other than its cash balances." The second appeal is from that order.

Without further proceedings, on June 18th, 1932, that order was modified by a further order which provided that "in modification of the order filed April 23, 1932, that the claims of the County Commissioners of Frederick County, in regard to their deposits aggregating $323,878.95, with the Central Trust Company, are hereby allowed preference, ratably with claims for uninvested balances of ordinary trust funds, in the distribution of the funds, amounting to $133,-912.70, of the Trust Company, which came into the hands of the Receiver as of the time of his appointment." The third appeal is from that order.

From this statement it appears that, while there were three orders, the order of April 25th, 1932, modified and superseded the order of March 29th, 1932, and the order of June 18th, 1932, modified and superseded the order of April 25th, 1932, so that the only question cognizable by this court growing out of the three appeals are those arising out of the passage of the order of June 18th, 1932, and the first two

appeals must be dismissed, since the orders from which they were taken were superseded and rescinded by the third and final order of June 18th, 1932. And, while the last order was passed at a time when an appeal from the first order was pending, in the state of the record it will be assumed that the case was reinstated by consent in the trial court subsequent to that appeal, and that the trial court had jurisdiction to decide the matters involved in that order.

The questions presented by the appeal are: (1) Did the agreement between the commissioners and the trust company of August 22nd, 1931, create a valid express trust? (2) If not, did the trust company hold the fund described in that agreement, and other public funds of Frederick County deposited with it in the name of the County Commissioners of Frederick County, as a trustee *ex maleficio*? (3) Were public funds of Frederick County held by it (a) under a valid express trust, or (b) as trustee *ex maleficio,* entitled under Code, art. 11, sec. 48, to a preference in the distribution of its assets? (4) If not, are the commissioners entitled to a preference as to public funds held by the trust company for them under either a voluntary or a constructive trust, when such funds can be identified, (a) over the uninvested balances of other trust funds held under valid voluntary or judicial trusts, or (b) over general creditors of the trust company? (5) If they are entitled to such preference, does the principle, which assumes that any cash balance, in the possession of a trustee with whose general assets the trust fund has become fused, includes the trust fund, extend to and include a specific identified part of the trust fund which the trustee has deposited to its credit in another separate and independent institution?

The facts of the case are not disputed, and may be thus stated:

For a number of years prior to 1931, the commissioners had been accustomed to deposit in the trust company in their name the proceeds of bonds issued and sold by them, and also moneys collected by them to accumulate for the payment of the principal of such bonds. In September, 1931, when

the trust company closed its doors, there were eight such deposit accounts, with balances aggregating $144,837.07, and extending over a period running from October 28th, 1924, to September, 1931. By chapter 216 of the Acts of 1931, the commissioners were authorized to issue and sell $186,-000 of refunding bonds to redeem bonds of a like amount issued and sold under prior acts. They did issue and sell such bonds, and received from the purchaser, the First National Securities Corporation, two checks, one for $4,092 dated May 25th, 1932, and one dated June 1st, 1932, for $189,259.97, which they deposited as received with the trust company. Both of those checks were deposited with the First National Bank of Baltimore to the credit of the trust company, and the county commissioners credited on the books of the trust company with the amount of the checks. Article 11, section 807, Code Pub. Loc. Laws of Md., in part provides that the county treasurer is "to receive all money which shall be due and payable to said county from any source whatsoever. * * * During the continuance of his office as treasurer, he shall collect all taxes levied by the County Commissioners and shall receive all moneys due to said county from any source whatever, including interest paid on such taxes as are in arrear, and deposit the same in some bank or banks, or trust company or companies of Frederick City, Maryland, bidding the highest rate of interest upon daily balance of such deposits and being ready and willing to furnish a depository bond satisfactory to the County Commissioners; and shall disburse the said moneys deposited under the provisions of law and the order of the County Commissioners, and pay over as the County Commissioners may direct all moneys received for said county, that may at any time be in his custody, charge or control, belonging to said county."

As early as April, 1931, Clinton McSherry, counsel to the commissioners, had suggested to them that under that statute all county deposits should be protected by corporate depository bonds, but, notwithstanding that suggestion, the deposits last referred to were made as other deposits had been

made theretofore, in the name of the commissioners and without requiring a depository bond. About the first of the following August, a conference between the commissioners, their counsel, and Mr. Emory L. Coblentz, president of the trust company, was called to consider the date at which the bonds to be redeemed from the fund of $186,000 were to be called for redemption. Coblentz was interested because his company had to have the money ready to redeem the bonds, and he suggested the first of the following January. McSherry suggested that they be redeemed at the time of the coupon dates, in September, October, and November, and, as the result of a "compromise," November 1st, 1931, was fixed as the redemption date for all the bonds. At that time there was some discussion of a depositary bond, but apparently nothing came of it then. But during the period of these negotiations some attention had been given not only to that question, but also to that provision of the statute which referred to the receipt of county funds by the county treasurer, and on August 15th, 1931, in answer to a request, their counsel advised the commissioners that "This law very plainly requires the Commissioners to deliver to the County Treasurer all funds of every description and requires the County Treasurer to deposit the same in such bank or banks as will pay the highest rate of interest on daily balances and furnish a depository bond satisfactory to the County Commissioners." On August 17th a letter was sent by the commissioners to their several depositaries, notifying them that all bids for deposits must provide for depositary bonds, but no bond was required of the trust company, for the reason that the commissioners had agreed to accept in lieu of a bond the trust agreement, to which we have referred, as to the $186,000 deposit. That agreement was drawn and executed apparently on August 22nd, and on August 31st, 1931, by a check presented after the close of the books of the trust company on August 29th, drawn by the county commissioners on the trust company, trustee, the $186,000 deposit was withdrawn, and, it may be inferred, transferred to the account of the Central Trust Company, trustee.

On May 25th, 1931, there was deposited with the trust company a check for $2,200, and on June 1st a check for $102,118.67, both drawn to the order of the commissioners by the purchasers of an issue of $100,000 of serial four per cent. bonds. Those checks were sent to the First National Bank of Baltimore, which credited the trust company with the amounts for which they were drawn, and it in turn credited the commissioners with a like amount. The balance due the commissioners on that account, on September 2nd, 1932, was $82,531.32.

On May 29th, 1931, the account of the trust company with the First National Bank showed a credit of $2,739.86, on July 10th a credit balance of $2,381.22, and on July 30th a debit balance or overdraft of $831.32. Prior to that overdraft $1,000 was transferred from the First National Bank to the trust company. At the time the receiver was appointed, the total cash in the hands of the trust company, in its main office and branch offices, was $106,171.69, and the receiver later received in addition to that sum, in cash balances from correspondent banks, $27,741.01.

It also appeared, from an exhibit filed March 21st, 1932, and marked "Trust Deposits," that, under the caption "Trust Department Corpus deposited in Savings Account, Central Trust Company of Maryland," there were "one hundred fifteen accounts at four per cent. interest totaling $192,-434.88, and twenty-one accounts at no interest totaling $195,-810.13, which includes $186,000.00 trust deposit of the County Commissioners of Frederick County, Maryland."

In connection with these facts, it will be noted that the order from which this appeal was taken limits the operation of the preference allowed the appellant to the funds, amounting to $133,912.70, which came actually into the hands of the receiver at the time of his appointment, or were received as credit balances from correspondent banks. The appellant apparently contends (1) that it is entitled to a preference in respect to the fund of $186,000 as to all assets of the trust company, on the theory that it was held under a valid express trust, and protected by Code, art. 11, sec. 48;

and (2) that, if the express trust is found to be invalid, nevertheless the fund of $186,000 and all other funds of the appellant deposited with the trust company were held by it under a constructive trust, and as such were entitled to the protection of that statute; and (3) that, even if not protected by the statute, the "beneficial owner" of the funds deposited with the trust company by the appellant is, as to such funds, entitled to a preference over general creditors, in the distribution of all assets of the trust company.

The appellee, while not stating it in so many words, appears to submit the contention that the order awarded the appellant more than it was entitled to receive, because (1) it was not entitled to the protection afforded by Code, art. 11, sec. 48; and (2) that, independent of statutory authority, it "can only recover deposits which can be traced," and that its funds deposited with the First National Bank cannot be traced, except possibly the sum of $1,000, and that its other deposits cannot be traced further than into the sum of $106,171.69, which the trust company had in its hands in cash when the receiver was appointed. But, inasmuch as there was no cross-appeal, the order cannot be reversed even if under it the appellant took more than in law or in fact he was entitled to receive (*Gordon v. Miller,* 14 Md. 204; *Lanahan v. Latrobe,* 7 Md. 268; 4 C. J. 697), so that the sole question is whether the appellant was injured by the order.

1. In respect to the question first stated, the learned chancellors who heard the case below said: "The County Commissioners are a governing body with limited powers. They can exercise only the authority with which they have been expressly, or as a reasonable implication, invested by law. *Peter v. Prettyman,* 62 Md. 566, 571; *Tasker v. Garrett County Commrs.,* 82 Md. 150, 153, 33 A. 407. There is no express legislative grant of power to the County Commissioners of Frederick County to create trusts of the funds under their control, and such a power is not implied in any authority definitely conferred. It is the plain intent of the law that they shall have and keep immediate control over the

deposits of the county funds, and it is not compatible with that purpose to delegate the application of such funds to a corporate or individual trustee. * * * In the absence of any express or implied power to transfer public funds to a trustee, and, in the presence of a specific direction to secure them by depository bonds, it seems clear that the method adopted in this instance, even if it involved the creation of a real trust, within the statutory meaning, should not be recognized as an adequate basis for the priority claimed in the petition." They accordingly held the so-called trust agreement void and of no effect. With that conclusion we are in entire accord. Assuming that, as between private persons, the agreement contained the essentials of a valid trust, the commissioners lacked the power to execute it. The county commissioners of a county constitute a body politic and corporate, possessing such powers as may be "prescribed by law" (Const. of Md., art. 7, sec. 1), and no others (*Chaney v. Anne Arundel County,* 119 Md. 385, 387, 86 A. 1039; 15 *C. J.* 457), and they have no implied powers but such as are necessary to the proper exercise of powers expressly conferred upon them (*Id.*). By chapter 216 of the Acts of 1931, the commissioners were authorized to issue and sell bonds to the amount of $186,000 for the purpose, and only for the purpose, of redeeming, with the proceeds of such sale, prior bond issues named and described in the act. Assuming for the question that they had the power to receive the proceeds of the sale of the bonds, they were entitled to receive such fund merely as custodians to hold for the specific uses to which it was dedicated and no other use or purpose. They were neither authorized to invest it, nor to surrender control of it to any other person or body except such as under the law were entitled to receive it. But the only persons entitled to receive or hold it under the act of 1931, or the public local laws of the state, were some financial institution, for the express purpose of paying upon their orders the bonds called for redemption, or the county treasurer. They had no power to invest it, nor had they the power to transfer control of it to a trustee who was not a county official authorized to receive it, and

who did not represent the holders of the bonds called for redemption.

2. The second question is whether the trust company held county funds deposited with it in the name of the commissioners under a constructive trust. The plain meaning and intent of article 11, sec. 807, P. L. L. of Md., is that the county treasurer shall "receive all money which shall be due and payable to said county from any source whatsoever," and, unless there is something in the language of chapter 216 of the Acts of 1931 exempting the commissioners from the application of section 807 in dealing with the proceeds of bonds sold under the act of 1931, their act in depositing such proceeds as well as other county funds in their names violated that section.

The only language of the act material to the question is that the "Board of County Commissioners of Frederick County, be and it is hereby authorized and empowered, in its discretion, to issue and sell * * * bonds on the faith and credit of said Frederick County, * * *" and that "upon the sale of the bonds * * * the proceeds thereof shall be used by the Board * * * for the purpose of redeeming the outstanding bonds heretofore issued; * * *" that the "County Commissioners * * * shall cause to be levied and collected * * * taxes" sufficient to pay the interest and principal of said bonds. If that act were the only legislation to be considered, it might well be inferred that it conferred upon the county commissioners power and authority to receive and disburse not only the proceeds from the sale of said bonds, but the funds collected for paying the interest to accrue on them and to retire them at maturity. But there is other legislation, the plain purpose and meaning of which is that "all money * * * payable to said county from any source whatsoever" shall be received by the county treasurer. That language was broad enough to include the proceeds of the sale of bonds as well as money received in payment of taxes, and such a construction is in no wise inconsistent with the provisions of chapter 216, Acts of 1931, for that act is silent as to the

custody of the funds received, and the direction that the proceeds of the sale of the bonds shall be applied by the commissioners to the redemption of outstanding bonds theretofore issued is consistent with the terms of article 11, section 807, P. L. L. of Md., which directs the treasurer to "pay over as the County Commissioners may direct all moneys received for said" county. What has been said of the act of 1931 is also true of earlier enabling acts to which our attention has been called.

And, when other provisions of that article of the Code of P. L. L. of Md. are examined, any possible doubt as to the application of section 807 to the proceeds of the sale of bonds by the commissioners under the Act of 1931 and earlier acts, as well as to funds collected for the retirement of such bonds, is dispelled. Neither by the Public General Laws nor the Public Local Laws of the State are the County Commissioners of Frederick County required to give bond, but the treasurer, as collector of county taxes, is required to give a bond of $50,000, and as collector of state taxes a bond in double the amount of the tax to be collected. Article 11, section 808, P. L. L. of Md. He is required to deposit all funds coming into his hands in some bank or banks, trust company or trust companies, in Frederick City, bidding the highest rate of interest on daily deposits, and "ready and willing" to furnish a depositary bond to be approved by the commissioners. The theory that the Legislature intended to leave vast sums of public funds in the absolute control and subject to the unfettered discretion of unbonded public officials is so obnoxious to the wise and prudent caution manifest in sections 807, 808, that, in the absence of some clear expression of such an intent, it must be assumed that the Legislature intended that funds arising from the sale of bonds, or from taxes levied to pay the same, should be received and held by the county treasurer as other money due or payable to the county would be received and held, and would therefore be protected as other county funds, not only by his bond, but by the safeguards thrown by the statute about the deposit of

funds in his possession. Assuming that they had the right to receive or collect them at all, and that question we are not called upon to decide, it was the plain legal duty of the commissioners to turn over, as received, all funds collected by them from the sale of bonds to the county treasurer, and their action in depositing the same with the trust company was contrary to law.

Under such circumstances, since the depositary was charged with notice of the statute, and had actual notice of the nature and character of the funds deposited, by the general weight of authority the funds so received were impressed with a trust in favor of the county, and the trustee held them for its use as a trustee *ex maleficio*. *Reichert v. United Savings Bank*, 255 Mich. 685, 239 N. W. 393, 394; 18 *C. J.* 580, note 29; 51 *A. L. R.* 1342, note.

3. In view of that conclusion, it becomes unnecessary to decide whether Code, art. 11, sec. 48, extends its protection to express trusts, since the question is whether that protection embraces involuntary constructive trusts. In respect to that, the chancellors held that: "In our opinion the priority clause of the Code provision referred to is not applicable to such a trust as the one now asserted. It arises because the deposits of public funds were made in disregard of the method, and without the security, prescribed by the local law. While the preference clause is broad in its terms, it evidently refers to trusts having a legal origin. The General Assembly could not be presumed to have intended by such a provision to declare priority for a trust resulting from the fact that another legislative enactment had been contravened." The conclusion and the reasons thus stated are not only consistent with reason and right, but flow from the very terms of the statute. The statute undertook to accomplish two things, first, to excuse trust companies from the necessity for giving bond as a natural fiduciary would be required to do; and, second, so far as possible to protect those entitled to rely upon the fidelity of such corporate fiduciaries from suffering loss through such exemption. To accomplish that, it first pro-

vided that: "No bond or other security shall be required from any trust company for or in respect to any trust to which it shall be appointed executor, administrator, guardian, trustee, receiver, committee, or depositary by the order of any court." Then it provided (1) that in all cases "in which such trust companies, whether incorporated under this article or by special act, shall be appointed, or shall be acting, as executor, administrator, guardian, trustee, receiver, committee, or in any other fiduciary capacity, they shall be responsible for losses of moneys or property received or held by them in any such character in the same cases and to the same extent as individuals so acting would be"; and (2) that, upon the dissolution or insolvency of such trust companies, "all debts or liabilities due or owing by such corporation in any of said fiduciary capacities, shall be preferred in the distribution of the assets of such company to all debts or liabilities of any nature whatsoever, including salaries and wages of employees and other preferred debts or liabilities."

The words "said fiduciary capacities," used in the last clause, can only refer to the fiduciary capacities specifically named in the first and second clauses, for they or like fiduciary capacities would be the only capacities in which a fiduciary would be required to give bond, and they would be the only cases in which beneficiaries injured by the wrongful acts of a fiduciary would be affected by the exemption of trust companies from the necessity of giving bond; and, even if the statute were held to include express voluntary trusts in which bonds might be required not only by the courts but by the parties, the reason for such a construction could not embrace trusts *ex maleficio,* which arise not from any agreement of the parties but by operation of law. In such a case there can be no bond, for, because of its nature, if a trustee *ex maleficio* gives a bond conditioned for the faithful performance of his duties, and such bond is accepted, he is *ipso facto* converted from a trustee *ex maleficio* into a trustee under an express or a judicial trust. And since such a trustee is not within the letter, the spirit, or the reason of the statute, its provisions afford no protection to the appellant in this case.

4.  Apart from the statute, the appellant is entitled to no preference or priority whatever, in the distribution of the trust company's assets, other than the right to receive any part of the funds in the hands of the trust company at the time the receiver was appointed held for its use which can be identified.   That, however, is not so much a preference as a right to recapture property which the trust company had no right at any time either to receive or to hold.   Whatever the prerogative right of the State to a preference in the distribution of the estate of an insolvent debtor may be, by the weight of authority its political subdivisions are entitled to no such preference.   65 *A. L. R.* 691; 51 *A. L. R.* 1339.   So that such rights as appellant has must be found in the trust relationship which the trust company assumed when it accepted the unlawful deposit of county funds.   That principle was recognized by this court in *Englar v. Offutt,* 70 Md. 78, 16 A. 497, 499, and, as stated by the court in that opinion, "the sole question, therefore, in every case where trust property is attempted to be traced, is whether it can or cannot be identified, either in its original or altered form."   There has been no departure from the rule thus announced, but, on the contrary, that case was approved in *Drovers' & Mech. Nat. Bank v. Roller,* 85 Md. 495, 37 A. 30, and *Italian Fruit & Importing Co. v. Penniman,* 100 Md. 698, 61 A. 694.   From those and other cases cited in 65 *A. L. R.* 692 *et seq.,* and 51 *A. L. R.* 1341 *et seq.,* it appears to be generally recognized that the right of the *cestui que trust* to receive back the trust property from the trustee is not strictly speaking a preference but a property right, although it often amounts to a preference.   The distinction, however, is very clearly indicated in *Poweshiek County v. Merchants' National Bank* (Iowa), 220 N. W. 63, 64, an action to recover trust funds from a receiver, where it was said: "Some confusion has crept into the decisions by the use of inaccurate language with reference to the terms 'preference' and 'preferred claims' in proceedings of this kind.   That we may attempt at least to clear up this apparent inaccuracy in the use of the terms, it may be said that a preference can only arise by rea-

son of some statutory provision or some fixed principle of common law which creates a special, superior right in certain creditors over others. It is wholly inaccurate to use the term 'preferred claim' when the effort is to secure from the possession of a receiver certain funds which are claimed to be a special deposit, or where it is sought to recover a trust fund. In the latter instance, the claimant says that the receiver has certain funds in his hands which he is holding in trust for the claimant which claimant is seeking to recover. It is quite apparent, therefore, that in the latter instance it is not a question of preference among various creditors of the insolvent estate, but an effort to secure funds which never, in law, did belong to the estate in the hands of the receiver."

There are cases to the contrary, and in one, cited by appellants, the decision of a federal court (*San Diego County v. California Nat. Bank,* 52 Fed. 59), it is held that the better doctrine is that, even where the identity of the trust property is entirely lost through confusion with other property, the confusion does not "destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor," but those cases are contrary to the prevailing rule and to the decisions of this court.

But while it is generally accepted that the right of a *cestui que trust* to recover trust property wrongfully held or converted by a trustee which he can identify is a property right, there is much conflict and confusion in the decisions as to what will be accepted as a sufficient identification.

It is not essential to a sufficient identification that the fund or property delivered to the trustee be traced in the precise or identical form in which it was received, but it is sufficient if it can be traced into some product of or substitute for the original fund. Consistently with that principle, it was held in *Drovers' & Mech. Nat. Bank v. Roller,* 85 Md. 495, 37 A. 30, that, where trust funds, which have been mingled with other funds by the trustee, remain in the insolvent estate and go to swell it, the identification is sufficient. And so it has

been held that a fund taken over by the receiver of an insolvent trustee as a part of the insolvent estate will be assumed to include the trust fund, on the theory that depletions of the general estate were from the proper funds of the trustee and not from the trust fund. But where it appears that the trust fund has been dissipated or so mingled and merged with the general assets of the insolvent estate as not to be separable or distinguishable therefrom, there is no identification, and the *cestui que trust* has no claim other than as a general creditor. *Drovers' & Mech. Nat. Bank v. Roller, supra; Marquette Fire & Water Commrs. v. Wilkinson,* 119 Mich. 655, 78 N. W. 893; *Englar v. Offutt, supra; Perry on Trusts,* p. 1407, sec. 828, note 11; 26 *R. C. L.* 1354; *Reichert v. United Sav. Bank, supra.* And, where the funds of the insolvent trustee taken over by the receiver at the time of his appointment include more than one trust fund, all such funds must share ratably. *Leach v. Farmers' Sav. Bank,* 204 Iowa, 1083, 216 N. W. 748.

5. The $186,000 deposit was made in the form of two checks, dated respectively May 25th, and June 1st, 1931, and, as those checks were deposited, the commissioners were credited on the books of the trust company with the amounts for which they were drawn, but the checks themselves were sent by the trust company to the First National Bank of Baltimore, and credited to the trust company on the books of that bank. It also appeared that on May 25th, and June 1st, 1931, respectively, two other checks, aggregating $102,-200, were deposited with the trust company and credited to the account of the commissioners, and that those checks were also sent to the First National Bank of Baltimore and credited by it to the account of the trust company. The funds so deposited were obviously part of the trust estate (*Reichert v. United Sav. Bank, supra*), but it does not appear with any certainty what disposition was made of them, except that on July 30th, 1931, the trust company's account with that bank was overdrawn. There was, it is true, reference to certain drafts on that account, but they were too indefinite to form

the basis of any judicial conclusion, and on the face of the record nothing more appears than that the amounts represented by those four checks passed out of the hands of the trustee into the hands of a third person, and that those identical funds were dissipated before the receivership. Upon that showing it could not well be said that there was, at the time of the receivership, any identification of those particular funds except as to $1,000 transmitted by the bank to the trust company before the overdraft. But the trial court held that it would be presumed that, as the trust company depleted its balance with the First National Bank of Baltimore, it substituted for such withdrawals funds of equal amount in its own vaults, and that such funds became thereby identified as a part of the trust estate. Upon that theory it allowed the commissioners, in regard to all their deposits, a preference, "ratably with claims for uninvested balances of ordinary trust funds", in the distribution of all funds which came into the hands of the receiver at the time of his appointment, which included not only the funds in the possession of the trust company and its branches, but also all balances due it from correspondent banks. If that theory was sound, the commissioners received all they were entitled to have. If it was unsound, they received more than they were entitled to have, at the expense of others entitled to priority in the distribution of the fund in the receiver's hands. But in neither event were they injured, because there is nothing in the record to identify the funds which they had deposited with any part of the trust estate other than that fund, so that as to the balance of the insolvent estate they are mere general creditors. *Reichert v. United Sav. Bank,* supra; *Drovers' & Mech. Nat. Bank v. Roller,* supra; *Englar v. Offutt,* supra; *Marquette Fire & Water Commrs. v. Wilkinson,* 119 Mich. 655, 78 N. W. 893. Since, therefore, the commissioners who have appealed could not possibly have been injured by the order, and since no other person who may have been affected or injured by it has appealed, the question as to whether the trial court correctly decided that,

as the trust company depleted the fund in the First National Bank of Baltimore, it substituted for it funds of its own in its own vaults, is not before this court for review and cannot be considered.

For the reasons stated, it follows that the order appealed from must be affirmed.

*Order affirmed, with costs.*

PARKE, J., dissents.