# THE DROVERS' AND MECHANICS' NATIONAL BANK vs. D. & W. ROLLER AND WM. LYNN.

*Following Trust Funds—Agency—Assignment for Benefit of Creditors—Money Collected from Sales by Commission Merchants and Spent Before Assignment for Benefit of Creditors is Made—Rights of Creditors of Party Holding Funds in Fiduciary Capacity—Partnership—Share of Profits.*

When goods are consigned to a commission merchant for sale, the title does not vest in the latter but remains in the consignor, and the money arising from a sale of them is the money, not of the agent, but of the owner of the consigned property. Hence, whenever such money can be traced it may be claimed by its owner; and if the agent makes an assignment for the benefit of creditors the trustee thereunder can have no greater right to the money than his grantor had.

If money held by a person in a fiduciary character is paid by him to his account at his banker's, the person for whom he held the money can follow it and has a charge on the balance in the banker's hands. And if a person who holds money in a fiduciary character pays it to his account at his banker's, and mixes it with his own money, and afterwards draws out sums by checks in the ordinary manner, the drawer must be taken to have drawn out his own money in preference to the trust money.

But when the money received by a fiduciary has been spent or dissipated by him in the payment of his other debts, and upon his becoming insolvent there is no balance at his banker's, the *cestui que trust* or owner of such money has no lien for the same upon the general assets of the debtor in preference to his other creditors, because in such case the trust funds do not remain in the insolvent estate and go to swell it.

A shipped goods to commission merchants for sale; they sent to A a check on a bank for the amount of the net proceeds of the sale of a part of the goods. Before this check was presented for payment, the commission merchants made an assignment for the benefit of creditors, and there were at that time no funds in the bank to their credit. Most of the goods were sold for cash and the sums received therefor were mingled with other funds of the commission merchants and paid out by them for other demands. A part of the goods were sold on credit and this amount was collected by the trustee under

the assignment.    A, the consignor, claimed a priority over other creditors of the commission merchants for the payment of their whole claim.    *Held*,

1st. That the proceeds of the sales of A's goods which were collected by the commission merchants themselves before the assignment, having been spent by them, did not go into the hands of the trustee, and as to this amount A is not entitled to priority but stands on the same footing as general creditors.

2nd. That the proceeds of the sales of A's goods which were collected by the trustee after the assignment, being capable of identification, belong to A and as to this amount A is entitled to priority of payment.

The fact that the compensation of an employee of a firm is measured by the amount of profits earned in one branch of the firm's business does not constitute him a partner.

Appeal from an order of the Circuit Court of Baltimore City (DENNIS, J.), overruling exceptions to an Auditor's report and finally ratifying the same.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE, ROBERTS, BOYD and RUSSUM, JJ.

*James McColgan*, for the appellant.

*S. S. Field*, for the appellees.

McSHERRY, C. J., delivered the opinion of the Court.

There are two questions to be disposed of on this appeal and they both arise upon exceptions to an Auditor's report. One involves quite an interesting question of law, the other chiefly a question of fact.    The circumstances out of which the first question grows are these : The firm or copartnership of Sheeler and Ripple had for a number of years been engaged in the live stock commission business in Baltimore. On the seventeenth day of January, 1895, D. & W. Roller, of Tennessee, consigned to Sheeler and Ripple for sale a quantity of live hogs which when received by the consignees on January the twenty-first, were sold in several lots for the consignors ; and on January the twenty-fourth

an account of sales, together with a check for the net amount of the proceeds after deducting commissions and freight charges, was mailed to the consignors. On the thirty-first of January Sheeler and Ripple being then and apparently having been for some months anterior thereto hopelessly insolvent, executed a deed of trust for the benefit of their creditors, and when the check given to D. & W. Roller reached in due course on the second of February the Drovers' and Mechanics' National Bank upon which it had been drawn, there were no funds in bank to the credit of the drawers—they having previously overchecked their account—and the check was dishonored. The funds actually received by Sheeler and Ripple for the hogs sold had been paid out on other checks given for other demands. Most of the hogs were sold for cash and the proceeds, without ear-mark or identification, were placed to the credit of Sheeler and Ripple intermingled with funds of their own in the Drovers' and Mechanics' National Bank where the partnership bank account was kept; but a portion of the hogs had not been paid for by the purchasers of them when the deed of trust was made, and afterwards the trustees collected and now have in their hands these particular proceeds of sales. D. & W. Roller filed their claim in the trust estate for the whole nett proceeds of sale and insist that they are entitled to a priority over other creditors to the extent of the whole nett proceeds of the sales of their hogs. The assets in the hands of the trustees consist of collections made by them, but except as just stated, do not represent the proceeds of the sales of Roller's consigned hogs, or the proceeds of the sale of any other property in which the proceeds of the sales of those hogs had been invested. The first question is: Are D. & W. Roller entitled, under these circumstances, to a preferential lien upon the general assets of Sheeler and Ripple in the hands of the trustees, for the full amount of the claim they have against the insolvent firm for the proceeds of the sales of the consigned hogs?

With respect to the proceeds of sale which actually went into the hands of the trustees after their appointment there can be and there is no difficulty whatever.   When goods or chattels are consigned to a commission merchant or broker for sale, the title does not vest in the latter, but remains in the consignor and the money arising from a sale of them is the money, not of the agent, but of the owner of the consigned property.   Hence, whenever the money can be traced it may be claimed by its owner, and upon an assignment being made for the benefit of creditors, the trustee can have no greater right to the money than his grantor, the consignee, possessed.   The proceeds of the sales of Rollers' hogs that have actually gone into the possession of the trustees and which are capable of identification, belong to the Rollers and must be paid over to them ; but quite another and a different condition exists in regard to the proceeds received by the insolvent firm and spent or dissipated by them before the trustees were appointed.

The general doctrine in relation to the right of the owner of property or the *cestui que trust* to follow and reclaim his property is, we think, thoroughly settled.   The early English cases only went to the extent of holding that the owner of property intrusted to an agent, factor or trustee could follow and retake his property from the possession of such agent, factor or trustees or others in privity with him, whether such property remained in its original, or had been changed into some different or substituted form, so long as it could be ascertained to be the same property or the product or proceeds thereof unless the superior rights of *bona fide* purchasers for value and without notice had intervened ; but that such right or reclamation ceased when the means of ascertainment failed, as when the subject of the trust was money or had been converted into money and then mixed and confounded in a general mass of the same description, so as to be no longer divisible or distinguishable.   The more recent rule, however, in England as to following trust moneys is broader and goes to the extent of holding that if

money held by a person in a fiduciary character has been paid by him to his account at his bankers, the person for whom he held the money can follow it and has a charge on the balance in the bankers' hands ; and that if a person who holds money in a fiduciary character pays it to his account at his bankers' and mixes it with his own money, and after-terwards draws out sums by checks in the ordinary manner, the drawer must be taken to have drawn out his own money in preference to the trust money. *Knatchbull* v. *Hallett,* 13 Ch. Div. 696. This Court in *Englar* v. *Offutt,* 70 Md. 78, following closely the Supreme Court of the United States in *Cent. Nat. Bk.* v. *Commercial Ins. Co.,* 104 U. S. 54, has announced the same principles. But it is now insisted that the doctrine has been expanded and amplified, and that though the funds cannot be traced or identified, a lien still exists upon the debtor's general assets in the hands of his trustee, in favor of the owner or *cestui que trust* whose prop-erty or money has been mingled with that of the fiduciary, and has been used by him in liquidating other claims against himself; and that this lien is a preferential one over other creditors of the debtor. The theory upon which this sup-posed enlarged doctrine rests, is that inasmuch as the wrongful application of the trust funds reduces the general indebtedness of the fiduciary, his assets, swelled to the ex-tent of that reduction, ought to be impressed with a trust or lien in favor of the person whose money or property has been improperly employed and used to discharge the indi-vidual indebtedness. There are some cases which support this view. *People* v. *City Bank,* 96 N. Y. 32 ; *McLeod* v. *Evans,* 66 Wis. 401; *Francis* v. *Evans,* 69 Wis. 115; *Brown* v. *Evans,* 71 Wis. 133; *Harrison* v. *Smith,* 83 Mo. 210, and some others. But it is obvious, even if these cases were not opposed to the general principles already alluded to, and even if they had not been questioned and some of them flatly overruled, that they proceed upon a wholly fal-lacious and untenable theory. They are founded upon the assumption that the misapplication of the trust funds by the

fiduciary to the payment of his own debts actually swells the volume of his assets. This is the introduction of a new and unsound principle into an old and well known doctrine of equity. But instead of such a misappropriation swelling the volume of the debtor's assets, it would merely diminish the amount of his indebtedness, and this would benefit the estate only to the extent that it increased the percentage that the other creditors would receive provided the amount of the misappropriation were not deducted as a preferred demand. The case of *People* v. *City Bank,* 96 N. Y. 32, which was followed in *McLeod* v. *Evans,* 66 Wis. 401, if it can be held to support this new doctrine (for it is a brief opinion resting on no well defined principle), is in conflict with the more recent case of *Cavin* v. *Gleason,* 105 N. Y. 256, wherein it was expressly decided in disposing of this very contention, that it was " quite too vague an equity for judicial cognizance ;" and that there was " no case. justifying relief upon such a circumstance." *McLeod* v. *Evans, supra ; Francis* v. *Evans, supra ; Brown* v. *Evans, supra,* determined by a bare majority of the Court, were subsequently overruled in *Nonotuck Silk Co.* v. *Flanders,* 87 Wis. 237—the opinion of the Court being delivered by one of the Judges who dissented in *McLeod* v. *Evans*—and those cases are consequently no longer authority even in the State of Wisconsin. In *Slater* v. *Oriental Mills,* 18 R. Is. 352; *Shields* v. *Thomas,* 71 Miss. 260; *Ferchen* v. *Arndt,* 26 Or. 121; (*S. C.,* 29 L. R. A. 664); *Philadelphia National Bk.* v. *Dowd, Receiver,* 38 Fed. Rep. 172; 2 L. R. A. 480; *Little, Trustee,* v. *Chadwick et al.,* 151 Mass. 109; 7 L. R. A. 570, the doctrine of the Wisconsin, Iowa, Kansas, Missouri and Texas cases is criticised and repudiated. The distinction between the two conditions that are presented when, *first,* trust funds remain in the insolvent estate and go to swell it; and when, *secondly,* trust funds have been dissipated or spent and used in the payment of debts due by the fiduciary, and, therefore, no longer constitute a part of his estate, is a perfectly manifest one ; and the fundamental error underlying the cases we have been

reviewing consists in confusing or confounding these essentially dissimilar conditions, and a consequent failure to distinguish between property which may be either specifically identified as belonging to the claimant, or money traced to and remaining in the hands of the factor or trustee, on the one hand; and, on the other hand, money arising from the sale of property confessedly never owned by the claimant or *cestui que trust*, or confessedly not purchased with money belonging to him. Creditors have no right to share in that which is shown not to belong to the debtor, and, conversely, a claimant has no right to take from creditors that which he cannot show to be equitably his own. But just here comes the argument that it is equitably his own, because the debtor has taken the claimant's money and mingled it with his estate, whereby the estate is swelled precisely that much. But obviously, as applicable to all cases, the argument is unsound. Where the property or its equivalent remains there can be no contention that the claim is just and enforcible; but where it has been dissipated and is gone, the appropriation of some other property in its stead simply takes from creditors that which clearly belongs to them. In one of the cases the illustration was used by KNIGHT BRUCE of a debtor mingling trust funds with his own in a chest; and in another SIR GEORGE JESSEL likened the situation to that of a debtor who had mingled trust funds with his own in a bag. Though the particular money cannot be identified, the amount is swelled just so much and the amount added belongs to the *cestui que trust*. But where *all* the money has been spent—where KNIGHT BRUCE's chest and JESSEL's bag is empty—there is no swelling of the estate at all; and in such a contingency it comes to this, that a Court of Equity is asked to order a like amount to be taken out of some other chest or bag, or out of the debtor's general estate, not because the creditors who are entitled to be paid out of that general estate have done any wrong, but because the debtor has been guilty of misconduct as a trustee. It comes down to the ordinary

case of misfortune on the part of the claimant or *cestui que trust* whose confidence in a trustee or fiduciary has been abused. *Slater* v. *Oriental Mills, supra.*

But the case of *Englar* v. *Offutt*, 70 Md. 78, affords, in our judgment, a complete answer to the contention of D. and W. Roller as respects that portion of their claim now under consideration. In that case it appeared that John P. Shriner had been engaged in business as a merchant and manufacturer under the name and style of J. P. Shriner and Company. In May, 1883, he was appointed guardian of two infants and received something over ten thousand dollars belonging to them. On the day he received this money he deposited nearly all of it in the Howard Bank to his own credit in an account kept in the name of John P. Shriner and Company. Against this and all other credits, aggregating considerably more than double the guardianship fund, he checked and drew out, as he needed the money, the whole amount of his deposits, except the trifling sum of forty-eight dollars and forty-nine cents. In December, 1885, Edward C. Shriner became a partner of his brother, John P. Shriner. In November, 1886, the firm made a deed of assignment for the benefit of creditors, and the trustees sold all the assets of the firm and these realized about nine thousand five hundred dollars. Thereupon the infants whose money had gone into the business of John P. Shriner filed a petition in the trust estate claiming a priority over the other creditors of the firm in the distribution of the net proceeds of the sales of the firm's assets. After stating the general rule as we have heretofore announced it, we said : " The sole question therefore in every case where trust property is attempted to be traced is, whether it can or cannot be identified either in its original or altered form." Then after discussing the evidence and showing that the whole trust fund had been drawn out, and that there was nothing in the testimony tending to show that the stock which went into the hands of the trustees had been purchased with the trust funds, the opinion proceeds : " And such being the case, the claim of the

appellants upon the fund for distribution is altogether too indefinite.   At most it is but matter of conjecture, for it is impossible to say, as this case is presented, and after the great lapse of time that has occurred, whether any, or, if any, what portion of the stock of goods that passed into the hands of the assignee, under the general assignment for the benefit of creditors, was the product of the trust fund belonging to the appellants.   *   *   *   It is clear, therefore, that the fund now in Court for distribution cannot be identified as the product of any investment of the original trust fund belonging to the appellants,'' who were the infants. And because this could not be done, the relief sought was denied, though, had the doctrine of the Wisconsin and other cases heretofore cited, been considered the law, the fund, notwithstanding the trust money had not been traced into the purchase of the firm's assets, could have been impressed with a preferential trust, and the ward's claim would have prevailed over the debts due to the general creditors of the firm.

In our opinion, then, so much of the claim of D. and W. Roller as the firm of Sheeler and Ripple actually collected before the appointment of the trustees, is not entitled to a priority because the funds had been spent or dissipated and did not in any form go into the hands of the trustees, and, therefore, as to that portion of their claim they are simply general creditors standing on the same footing with other general creditors of Sheeler and Ripple; though as to so much of the proceeds of the sales of the consigned hogs as the trustees have collected and which, consequently, is capable of identification, the Rollers are entitled to a priority.

The remaining question, chiefly one of fact, arises on the claim of William Lynn.   It has been objected that he is not entitled to prove his claim because he was a member of the insolvent firm.   Of course if he had been a member of the firm he would not be allowed to compete with the firm's creditors; and the question as to whether he was or was

not a partner is really the only question involved.   After a careful examination of the evidence in the record we are convinced that he was an employee and not a partner.   His compensation was measured by the amount of the profits earned in one branch of the business, but he was not on that account a copartner.   The firm of Sheeler and Ripple was composed of John N. Ripple and T. Brandon Silcott, and the petition filed in this case by the trustees asking the Circuit Court to assume jurisdiction in administering the trust makes no averment that Lynn was a partner ; nor was the deed of trust itself signed by him.   It would serve no useful purpose to go into an analysis of the somewhat lengthy evidence bearing on this question of fact, and we consequently content ourselves with stating the *result* of our examination of it.   The Circuit Court decided that Lynn was not a partner and in this conclusion we concur.

Inasmuch as the learned Judge below held that D. and W. Roller were entitled to have their whole claim treated as a preference to be paid in full, and as we do not agree with him in this, so much of the order appealed from as allows this claim in full will be reversed and the cause will be remanded that a new order may be passed allowing as a preference the amount of the proceeds of Rollers' hogs collected by the trustees after their appointment, and placing the balance of the claim on an equal footing with other general creditors.   In so far as respects the claim of Lynn the order appealed from will be affirmed.   The costs incurred in the Roller claim must be paid by Rollers, and those incurred on the Lynn claim must be paid by the appellant.

> *Order reversed in part and affirmed in part and cause remanded. Costs to be divided as above indicated.*

(Decided April 1st, 1897).