**MacBRYDE v. BURNETT et al.**

Civil No. 1137.

District Court, D. Maryland.

May 4, 1942.

834

J. Morfit Mullen and R. Contee Rose, both of Baltimore, Md., for plaintiff.

Hilary W. Gans (Brown & Brune) and Vernon Cook (Cook & Markell), all of Baltimore, Md., for defendant Burnett.

Edwin Morgan (Semmes, Bowen & Semmes) of Baltimore, Md., for other defendants.

CHESNUT, District Judge.

In this case the beneficiaries in remainder of a trust fund seek an accounting from the fiduciary of the fund. Certain questions of jurisdiction and procedure have heretofore been considered and passed upon. D. C., 41 F.Supp. 661. The merits of the controversy have now been heard on evidence submitted in open court including numerous exhibits. The larger contention of the plaintiff is that the defendant, Paul M. Burnett, the president of the Monumental Life Insurance Company of Baltimore, as fiduciary of the fund, should be held accountable for profits allegedly made by the use of the fund directly or indirectly in the purchase of certain shares of stock of the Life Insurance Company in the amount of about $200,000. The defendant denies that the trust fund was in any way used by him in the purchase of the stock. There are also subordinate questions as to what constitutes the proper corpus of the fund apart from the disputed fact as to profits.

From the evidence in the case, I make the following *findings of fact:*

1. The original trust fund was created by the will of Mary Donaldson of Baltimore who bequeathed a sum of $10,000 to Sarah J. Parker, also of Baltimore, for life, with remainder to the two brothers and a sister of the life tenant in such shares as might be appointed between them by the will of Sarah J. Parker. The will of Mary Donaldson was probated in the Orphans Court of Baltimore City on May 27, 1920. Sarah J. Parker died November 12, 1940, and by her will, dated March 23, 1927, and probated November 15, 1940, she appointed her two brothers and sister to take equal shares in the fund. The two brothers of Sarah J. Parker were LeRoy Parker of Virginia and Robert B. Parker of Vermont, and the sister was Mary D. Winder, then a citizen of Maryland. Robert B. Parker predeceased his sister Sarah J. Parker, and his personal representatives have been made parties in this case. LeRoy Parker died shortly after the death of his sister Sarah J. Parker, and the plaintiff, Malcolm H. MacBryde, Jr., claims the share of LeRoy Parker by virtue of the will of LeRoy Parker and probate proceedings thereunder. Mary D. Winder, now a non-resident of Maryland, has recently intervened in this case. There is a question, which has not yet been submitted to the court, as to what share, if any, of the corpus of the fund the representatives of Robert B. Parker are entitled to take.

2. The defendant, Paul M. Burnett, was the attorney at law of Sarah J. Parker, the life tenant, and he qualified in the Orphans Court of Baltimore City as administrator d.b.n.c.t.a., under the will of Mary Donaldson. In due course he filed an administration account in which the avails of the $10,000 legacy, to wit, $7,739.69, was distributed to Sarah J. Parker as life tenant; but in fact the corpus of the fund was never delivered by Burnett to Sarah J. Parker, but has ever since been handled, invested and reinvested by him. His stated position in the matter is that he was not a technical trustee but really acting only as financial adviser and attorney for Sarah J. Parker. Nevertheless it is not disputed by his counsel in the case that in handling the fund he is to be charged in this case as a trustee.

3. In 1922 Burnett obtained an order of the Orphans Court of Baltimore City authorizing him to invest the fund in stock of the U. S. F. & G. Co., a Baltimore corporation. The income from this stock was paid over by him until 1928 to Sarah J. Parker as life tenant. In 1928 he obtained a further order of the Orphans Court of Baltimore City to sell the stock then amounting to 80 shares. He then sold 75 shares of the stock at a very handsome profit, and received as the proceeds the gross sum of $34,677.23. He retained 5 shares unsold which, as increased by certain "rights" issued by the Company, and by a stock split-up, now consists of 35 shares of stock of the Company and 1 share of stock of the Fidelity & Guaranty Fire Corporation, a subsidiary. All of the 75 shares of U. S. F. & G. Co. stock were not sold at one time, but from time to time between May 4, 1928, and September 18, 1928. The proceeds of sale were first deposited

by Burnett in his personal checking account with The Real Estate Trust Company of Baltimore, a subsidiary or affiliate of the Monumental Life Insurance Company. After a short interval of time the respective receipts (less a commission of 5% of the principal then claimed by Burnett as trustee amounting to $1733.86) were redeposited by him in a savings account in The Trust Company in the name of Paul M. Burnett, Trustee. The maximum amount of the trust fund as so deposited in the savings account was $32,947, which was the balance in the account on September 29, 1928. This was the aggregate amount of the proceeds of sale of the U. S. F. & G. Co. stock, with the exception of the 5% commission retained by Mr. Burnett in the amount of $1,733.86. On March 13, 1929, Burnett withdrew and paid as trustee the sum of $1,372.32 as the federal income tax on the profit to the estate from the sale of the stock. On June 5, 1929, $25,000 was withdrawn from the account and sent to New York to be loaned out at interest. This sum of $25,000 was returned and redeposited in the trust account on October 31, 1929, seven days after the New York Stock Market "crash" on October 24, 1929. In the meantime the remainder of the corpus of the trust fund, about $6,000, was withdrawn from the account and applied in payment for investments in bonds, which will be later more particularly mentioned.

4. The major contention of the plaintiff is that the $25,000 in the trust fund as just above mentioned was used either directly or indirectly, actually or constructively, by Burnett for the purchase of shares of stock of the Monumental Life Insurance Company, and on which the evidence shows he has made a very extraordinary profit of approximately 1000% on the money originally invested in the stock. More specifically the contention is that the $25,000 of trust money was so used to purchase 230 shares of this stock which now, by reason of stock split-ups, stock dividends and market increases approximates in value $250,000. The principal facts disclosed by the evidence with relation thereto are as follows:

5. From prior to 1900, Mr. Burnett was an officer of the Mutual Life Insurance Company, a mutual insurance company engaged principally in writing industrial life insurance. About 1927 Burnett and some of his associates conceived the plan of reorganizing the Insurance Company whereby it would be converted from a mutual to a stock ownership company. We are not here concerned with the details or consequences of this plan except to note the fact that it resulted through the acquisition of a large block of the stock by Mr. Burnett in the unusually large profit, a part of which is now claimed on behalf of the beneficiaries of the trust fund. In February 1928 Burnett subscribed and paid $116,550 for 1060 shares of the stock of the new Monumental Life Insurance Company. The larger part of this money was borrowed by him from four separate banks, some of the loans being secured by collateral. The stock was taken in the name of Burnett and was fully paid for by him from the proceeds of the loans *some months before* any of the U. S. F. &. G. Co. stock belonging to the trust fund was sold, and the proceeds of sale received by him. It is clear therefore that no part of the original purchase price paid by Burnett for the life insurance stock came from the proceeds of the sale of the stock in the trust fund.

6. Further facts relating to the $25,000 item in the trust fund appear from the evidence. On October 31, 1929 the balance to the credit of the trust fund in the name of Paul M. Burnett, trustee (see plaintiff's Ex. No. 15) was $25,064.94. About October 20, 1929, Burnett left Baltimore on a vacation lasting several weeks. Before going he left orders with his stock brokers, Messrs. Baker, Watts and Company of Baltimore, to purchase for his account a number of shares of miscellaneous stocks including—

| | |
|---|---|
| 100 shares Anaconda Copper at 100 or | $10,045.43 |
| 200 shares Kelvinator Co. at 10 or | 2,027.69 |
| 200 shares Silica Gel at 24 or | 4,833.00 |
| 100 shares Standard Oil of N. Y. at 70 or | 7,037.92 |
| | $23,934.64 |

While Mr. Burnett was still away these stocks were delivered by Baker, Watts and Company to The Real Estate Trust Company, of which Mr. Milton B. Roberts, a close business associate of Mr. Burnett, was president. Mr. Roberts said he knew that Mr. Burnett was buying some stocks and after conferring with Mr. Burnett's secretary, a Miss Reany, recently deceased, he authorized payment for the

above stocks from Mr. Burnett's trust account in the aggregate purchase price of $23,943.64. At the same time Baker, Watts and Company also presented for payment 100 shares of Anaconda Copper stock at 80, for a total of $8,034.73; and 100 shares at 75, for a total of $7,526.25, or an aggregate of $15,561, which was paid for by Mr. Roberts from other funds for the personal account of Burnett. The entries in the savings account of Paul M. Burnett, Trustee, show withdrawals on November 7, 1929, of $12,072.72; on November 12, 1929, of $4,833, and on November 13, 1929, of $7,037.92, a total of $23,943.64.

7. Mr. Burnett returned to Baltimore about November 18, 1929. He was then informed by Mr. Roberts with regard to these last named stock transactions. According to Mr. Burnett's testimony he then stated that it had been his intention that the trust funds should be used only for the purchase of 300 shares of Anaconda Copper Company stock of which 100 shares were bought at 100; 100 shares at 80 and 100 shares at 70, or a total purchase price of $25,000. The last named 100 shares had also been bought by Burnett and paid for. He says that he had consulted with Miss Parker, the life tenant, respecting this investment and had made it for the trust fund only after inquiry from persons whose advice he thought reliable, and that he knew the market price of the Anaconda stock had recently declined, prior to October 24, 1929, from about 175 to 100. Both Burnett and Roberts testified that thereupon bookkeeping entries, of a rather complicated and superficially rather confusing nature, were made in the trustee account to give effect to Mr. Burnett's intention. Accordingly checks were exchanged between Mr. Burnett and Mr. Roberts whereby there was re-deposited on November 18, 1929, in Burnett's trustee account, $23,-943.64, and $25,000 was immediately again charged as a withdrawal from the account. According to this testimony which was uncontradicted, the result was that Burnett purchased for the trust account 300 shares of Anaconda Copper stock for $25,000.

8. Some time after November 18, 1929, Burnett conferred with Miss Parker who expressed dissatisfaction with the investment of $25,000 in Anaconda Copper stock as it was still further declining on the market. Thereupon Burnett says that he assured her that she should sustain no loss in the transaction and that he would personally see that she was paid for the rest of her life interest at 5% per annum, payable quarterly, on $25,000, and that these quarterly payments were continuously thereafter made by him to her. In 1932 the market price of the Anaconda Copper stock had declined to $3 per share, and Burnett says that he felt concerned about the trust fund and thereupon determined to put the *orginal amount* of the fund, which he fixed at $7,800, in currency in a safe deposit box at The Real Estate Trust Company which he carried in his name as trustee, and that the amount so deposited in the box remained there until after Miss Parker's death when it was exhibited to Mr. Mullen, the attorney for the plaintiff. Later Burnett sold the Anaconda Copper stock at $3 per share without conferring with Miss Parker or other persons.

9. After Miss Parker's death in 1940 Mr. J. Morfit Mullen, a Baltimore attorney, was retained on behalf of some of the beneficiaries in remainder of the trust fund, to ascertain its status. They were not informed with regard to any of the dealings in the trust fund heretofore mentioned. When inquiry was made from Mr. Burnett about the fund he at first took the position that the corpus of the fund consisted only of the cash in the amount of $7,800 and without disclosing the above facts regarding the fund; but after further investigation of the matter by Mr. Mullen, Mr. Burnett retained Mr. Hilary W. Gans and Mr. Vernon Cook as counsel, and shortly after the institution of this suit on May 2, 1941, Mr. Burnett, on advice of his counsel, changed his position in this respect, and stated his willingness to substitute $25,-000 in cash for the Anaconda Copper stock, and to account for the balance of the trust fund by delivery of the remaining investments constituting the corpus, and a cash sum representing the commission of 5% on the corpus which he had retained from the proceeds of the sale of the U. S. F. & G. Co. stock. Specifically he agreed to turn over as the corpus of the fund the following securities and cash: 35 shares U. S. F. & G. Co. stock; 1 share Fidelity & Guaranty Fire Corporation stock; $1,000 Washington & Vandermere 4½% bond; 200 shares Socony Vacuum Co. stock, and cash in the amount of $25,948 (now conceded to be $26,148).

10. Neither the life tenant, Miss Parker, nor Mr. Burnett kept any separate accounts of the corpus or the income of the

trust fund. Much of the difficulty of this case is due to the failure to keep such an account. Mr. Burnett's excuse for failure to keep proper accounts of the trust fund is because he did not consider himself at the time as a technical trustee but rather as a financial advisor and attorney for the life tenant; and that all the income from the trust estate, with the exception of dividends from the Anaconda Copper stock, were paid over immediately upon receipt to Miss Parker who was in very close communication at all times with Mr. Burnett's secretary. After this controversy had arisen Mr. Burnett had the account re-constructed by Mr. Lowree, a junior officer of The Real Estate Trust Company, with accounting experience. A statement of the account as so re-constructed from piece-meal information was furnished to counsel for the plaintiff in the spring of 1941. It has been filed in the case as Defendant's Ex. No. 1, and, according to the testimony, is substantially an accurate account of the several financial transactions relating to the fund. In making some of the investments for the fund Burnett dealt with his stock brokers in his own name but some times as trustee. When bonds were purchased they were not registered in the name of the trustee but he says he kept them in the safe deposit box for the trust. When stocks were purchased they were not registered in the name of the trustee but were carried in the name of the brokers endorsed by the latter. No accounts were kept showing the income from the estate or the disposition thereof although there is no contradiction of Burnett's testimony that all the income was properly paid over to the life tenant.

11. The plaintiff has introduced some additional evidence of a circumstantial nature strongly relied upon to support the main contention regarding the trust item of $25,000. It is here stated, although I have been unable to find that it has any important significance, because not sufficiently related to the contention. In 1928 Burnett and his wife made a revocable family deed of trust to The Real Estate Trust Company as trustee, reserving, however, the power to amend it from time to time. The property conveyed consisted at first of a large number of ground rents valued at about $70,000, and subsequently a large number of shares of life insurance stock were added to the trust. The trustee's ledger account of this trust bears an early notation to the effect that the original trust was amended in some respect with reference to life insurance stock. This amendment has not been produced and it is said cannot be found. Neither the trust officer nor Burnett could remember its contents. On July 12, 1934, Burnett obtained from the trustee a promissory note payable on demand for $25,000, and payable with interest at 5% to Paul M. Burnett, *Trustee*. By its terms this note was payable only from the proceeds of the particular trust fund without personal liability of the trustee. No payment was ever made on account of the note. The note was produced and bears the notation under date of September 3, 1935, that it was "settled and satisfied". About the same time the trustee re-delivered to Burnett 9200 shares of life insurance stock. The recollections of the officer of the trustee, Mr. H. E. Singewald, and of Mr. Burnett, are both vague, imperfect and uncertain with respect to this transaction. Burnett cannot remember why the note was asked for or given or what was the trust referred to in the note in describing him, the payee, as trustee. His best recollection seemed to be that both the ordinary family trust and the note were inspired by the motive of avoiding possibly income or gift taxation. He categorically denied that the note in any way related to the Donaldson trust. The 9200 shares of life insurance stock represented 230 original shares of the stock increased in number as a result of various stock dividends and stock split-ups. The original purchase price to Burnett of 230 shares of original stock was about $25,000. The plaintiff emphasizes the similarities in amounts of the stock and the $25,000 in cash as circumstantial evidence supporting his main contention. But there is no further evidence to relate the circumstances to the trust fund under the Donaldson will.

12. As has been stated, the net amount of the Donaldson trust fund resulting from the sale of the U. S. F. & G. Co. stock, in addition to the $25,000 item (and the disputed 5% commissions) included about $6,000 in cash. This was invested by Burnett in the summer of 1929 in various high grade bonds which, with one exception ($1,000 Washington & Vandermere 4½'s) were sold or redeemed at various dates thereafter between 1929 and 1934. In the meantime, however, Burnett purchased on September 9, 1930, 200 shares of Standard Oil of New York, at 30⅝, at a total purchase price of $6,155. Apparently this

stock was not immediately paid for but was carried on margin with the stock brokers secured by some or all of the bonds in the trust, and the proceeds of the bonds when sold or redeemed were applied on account of the purchase price for the stock. This stock at the time of the purchase had a good financial reputation but has materially declined in market value so that it is now worth about $1,400 as compared with the original purchase price of over $6,000. Burnett says that Miss Parker herself requested him to buy this stock.

13. Of the original 80 shares of U. S. F. & G. Co. stock (which were registered in Burnett's name as *administrator*) Burnett did not sell 5 shares. When the 75 shares were sold, he says that the brokers returned to him a certificate for the remaining 5 shares made out in his name individually. This 5 shares, by virtue of the issuance of stock "rights" and a stock split-up has now been transformed into 35 shares of U. S. F & G. Co. stock and 1 share of Fidelity & Guaranty Fire Corporation. Burnett says that the certificates for these shares, although in his name individually, have been kept in the trust box and that he has made no personal use of them. The market value of these particular retained stocks is now approximately the same as their original purchase price, but during 1929 the U. S. F. & G. Co. stock at one time had a maximum market value of about $92 per share, approximately four times greater than its present market value. The plaintiff contends that the failure of Burnett to sell the stock pursuant to the authority given him by the order of court, and the fact that he permitted the stock to be put in his individual name makes him liable to account for the value of the stock at its maximum market price.

### Conclusions of Law

Applying the rules of law to these facts, my conclusions of law are as follows:

1. The plaintiff is entitled to recover from the defendant the trust item of $25,000 in cash with simple interest thereon at 6% accumulating from the date of the death of the life tenant;

2. The plaintiff is not entitled to any profits realized by the defendant from his purchase of stock of the Monumental Life Insurance Company;

3. The plaintiff is entitled to have the defendant account for the cash purchase price of the 200 shares of Standard Oil Co. of N. Y. ($6,155) as a part of the corpus of the trust fund, with interest thereon at 6% from the date of the death of the life tenant;

4. The plaintiff is not entitled to recover from the defendant the market value or any other cash equivalent for the 35 shares of U. S. F. & G. Co. stock and 1 share of Fidelity & Guaranty Fire Corporation stock, which still constitutes a proper part of the present trust fund; with accumulated dividends thereon;

5. The trust fund also properly includes the $1,000 par value Washington & Vandermere 4½% bond, with the income accruing thereon subsequent to the death of the life tenant;

6. The defendant must also account for $1,148.60 in cash, with interest thereon from the death of the life tenant as a part of the trust fund. The defendant is not entitled to the 5% commission.

### Opinion

The legal problem in this case is to determine what properly constitutes the present corpus of the trust fund created by the Donaldson will. Apart from the 5 shares of U. S. F. & G. Co. stock never sold by the defendant, the gross proceeds of sale of 75 shares of U. S. F. & G. Co. stock was $34,677.23. The whole of this amount was first deposited by Burnett in his personal and individual checking account in The Real Estate Trust Company; but shortly thereafter the whole amount less a commission of 5% on the principal was deposited in a trustee's account in the savings department of the Trust Company. Subsequently this fund was invested or otherwise used by Burnett as stated in the aforegoing recital of facts. In ascertaining the proper accounting for the corpus of the fund, four questions are presented: (1) Whether the defendant was entitled to deduct a commission of 5% of the principal; (2) whether he is accountable for any profits realized from his investments in stock of the Monumental Life Insurance Company; (3) whether he is accountable for the cash purchase price of the investment of the moneys of a portion of the trust fund in 200 shares of Standard Oil Co. of N. Y. stock (now Socony Vacuum Co.); (4) whether the defendant must account for the maximum market value of the 5 shares of U. S. F. & G. Co. stock not sold. I will discuss these several questions in their order.

■ **1.** *As to the 5% commission.* Burnett says Miss Parker, the life tenant of the fund, agreed to this commission; but it does not appear that she had the authority to bind the remainder interests in the fund by her agreement. Intrinsically considered, at the time the amount was retained by Burnett, it was probably not an unreasonable fee. Very possibly the Orphans Court of Baltimore City would have allowed it if Burnett as administrator had filed an appropriate petition therefor. But this he did not do, and the question now presented is whether it should be allowed in the accounting. I conclude that it should not be allowed in view of all the circumstances of the case. The contention that it should be allowed is not seriously pressed by counsel for Burnett. It is unnecessary here to repeat in detail the circumstances which require its disallowance. It is sufficient to say that at the very best the fund was very loosely handled by Burnett as trustee; he kept no books of account for the trust either of income or principal; he handled the fund in many respects substantially as if it were his own property, and with little or no regard for the rights of the remaindermen. Upon the death of the life tenant he originally took a position with respect to the corpus of the fund which was legally indefensible, although it was soon thereafter abandoned on advice of competent counsel. The trustee was experienced in both legal and financial affairs. His loose and unbusinesslike method of handling the trust fund, and his evasive attitude at the inception of the controversy have caused a long and expensive litigation.

■ **2.** *The alleged profits on life insurance stock.* This is the important item in the controversy. The beneficiaries of the fund in remainder contend that Burnett as trustee must be held accountable for subsequent profits realized on purchase of life insurance stock to the extent of an original purchase price of $25,000, or 230 original shares of the stock now representing by stock split-ups and stock dividends, 9200 shares having a present market value of over $200,000. The legal proposition advanced for the remaindermen is that when a trustee commingles trust funds with his own and uses the blended fund in whole or in part for the purchase of property whereby he subsequently makes a profit, the burden is cast upon him to affirmatively show that no part of the trust funds were used either directly or indirectly for the realization of the profit; otherwise he is accountable for the profits realized at least in the proportion that the trust funds bear to the whole commingled fund. This general proposition of law is not disputed in this case. Counsel for all parties agree that the applicable controlling law is to be found in the decisions of the Maryland Court of Appeals; but on this subject matter, as applicable to this case, there is no substantial difference between the Maryland law and the law affecting fiduciaries generally including federal decisions. Englar v. Offutt, 70 Md. 78, 16 A. 497, 14 Am. St.Rep. 332; Drovers' & M. Nat. Bank v. Roller, 85 Md. 495, 37 A. 30, 36 L.R.A. 767, 60 Am.St.Rep. 344; Vansant v. State, 96 Md. 110, 53 A. 711; Lawson v. Burgee, 131 Md. 436, 103 A. 516; Carey v. Safe Deposit & Tr. Co., 168 Md. 501, 178 A. 242; Frederick County Com'rs v. Page, 163 Md. 619, 164 A. 182; Corbett v. Hospelhorn, 172 Md. 257, 191 A. 691; National Bank v. Insurance Co., 104 U.S. 54, 26 L.Ed. 693; A.L.I. Restatement Trusts, s. 202, and Maryland Annotations thereto by Prof. Reiblich; 4 Bogert, Trusts and Trustees, § 921 et seq.; Schumacher v. Harriet, 4 Cir., 52 F.2d 817, 82 A.L.R. 1; Hood v. Hardesty, 4 Cir. 94 F.2d 26; Jennings v. United States F. & G. Co., 294 U.S. 216, 55 S.Ct. 394, 79 L.Ed. 869, 99 A.L.R. 1248; 27 Harvard Law Rev. 125 (Scott).

■ In general, the legal problem here is one of "tracing trust funds". The problem is primarily factual but in its application to almost innumerable complicated and varying situations many courts have reached what in principle would seem to be irreconcilable results. One general line of demarcation on the authorities is between courts which require *strict proof* of *identification* of a trust fund or its product, no matter how often changed in form, as sufficient for the tracing, and other courts which have adopted a much more liberal rule by finding in various situations as sufficient identification the fact that a particular fund involved in controversy has been *augmented* by the trust fund sought to be traced. This latter is called the "swollen fund" theory. See 4 Bogert, Trusts and Trustees, § 921 et seq. This more liberal rule in aiding the beneficiary to trace his improperly diverted trust fund has frequently been applied in cases of the deposit of trust funds in a subsequently failed bank, or in other cases dealing with

the assets of an insolvent trustee. But we have an entirely different situation here. The trustee is admittedly entirely solvent; and the contest is not between beneficiaries of a fund and general unsecured creditors of a trustee or an insolvent bank. Therefore in the present situation the problem of "tracing" is simpler than in many other cases. To recover here the beneficiary must convince the court from the evidence as a whole, either by affirmative evidence or proper presumptions, that the trust funds were used in creating the profit claimed.

The plaintiff's difficulty is not with the law, but with the facts. While the trust fund was in many respects very loosely handled, the plaintiff has not shown any commingling of trust funds with individual funds of the trustee except for the very limited period of time that the trust funds were in the defendant's checking account in The Real Estate Trust Company. Nor does the evidence show any use of the trust funds either when so temporarily commingled, or otherwise, in payment for the life insurance stock purchased by Burnett. The inescapable fact shown by documents, bank records and other exhibits in the case is that all the life insurance stock was bought and paid for by Burnett prior to his receipt of any of the moneys of the trust fund resulting from the sale of the U. S. F. & G. Co. stock. It is true that the stock was paid for by Burnett principally from money borrowed from banks, but these loans were made and their proceeds used in payment for the stock several months before Burnett received the trust funds in question. There is no evidence to show that any part of the trust funds were used by Burnett to secure these bank loans and, although the loans were not wholly paid off until some years later, there is no evidence to show that any part of the trust moneys was used to repay them. The nearest approach to any evidence along this latter line is in the item of a withdrawal of $2,500 from Burnett's checking account at a time when the trust moneys were temporarily on deposit there; but it affirmatively appears from the same records that at that time Burnett had in his checking account considerably more than $2,500 of his own money. In these circumstances the proper presumption is that Burnett used his own money and not that of trust moneys in making the payment to discharge his personal obligation. Drovers' & M. Nat. Bank v. Roller, 85 Md.

495, 37 A. 30, 36 L.R.A. 767, 60 Am.St.Rep. 344; 4 Bogert, § 926, p. 2678, and cases cited including In re Hallett Estate, 13 Ch. Div. 696. Furthermore the particular bank loan so partially repaid was said by counsel to have been an unsecured loan; and therefore the payment could not give rise even to a lien in favor of the trust fund by subrogation. A.L.I. Restatement Trusts, § 202, sub-sec. g; Restatement, Restitution, §§ 162 and 207. Even if there were a lien it is unimportant in this case as the trustee is entirely solvent.

Not only does the evidence fail to show any application of the $25,000 of the trust fund to the purchase of life insurance stock, but on the contrary it does affirmatively show that the $25,000 was used by Burnett in part payment for about $41,000 purchase price of miscellaneous speculative stocks bought by him through Baker, Watts & Company in November 1929, and it appears that the investments so made resulted in a substantial loss and not in a profit. Burnett says that he applied the $25,000 for the purchase of 300 shares of Anaconda Copper stock included in these purchases. There is no contradiction of his testimony as to this particular application of the trust moneys, so far as the somewhat complicated banking records disclose. He subsequently sold the 300 shares of stock of Anaconda Copper for about $900, thus sustaining a loss of $24,100 on this particular item. He says that the investment was made after careful inquiry, but that when Miss Parker, the life tenant of the fund, expressed anxiety about it he agreed with her that he would personally pay her 5% interest on the $25,000 fund during her lifetime. Apparently nothing was said as to the responsibility thereafter to the beneficiaries of the fund in remainder. In all the circumstances it is quite clear that the investment was not a reasonably prudent one to be made by a life tenant or the trustee of a fund. Although when called on for an accounting Burnett at first took a position to the effect that he was not responsible for the loss, he subsequently abandoned this position on advice of counsel and has conceded his liability to restore the $25,000 to the fund. The only important point to here note is that the use made by Burnett of the $25,000 resulted in a substantial loss and not in a profit.

Counsel for the plaintiff rely strongly on the circumstances above outlined in the findings of fact with regard to Burnett's

family trust and particularly the giving of the $25,000 note by the trustee to Burnett *as trustee*. But I am unable on the evidence to logically relate this circumstance to the plaintiff's contention, or to find in it any significance affirmatively tending to show that Burnett used the $25,000 of the fund to realize profits from his investment in life insurance stock. It is true that defendant's testimony with regard to this note is entirely vague, unsatisfactory and unconvincing. His counsel concede that in the absence of further explanation about it, it was a most unusual if not quite unique transaction. But plaintiff's counsel have not been able to show its significance, if any, in support of their contention. It is a possibly plausible inference that Burnett feared he might be some time called upon to account for a misapplication of trust moneys to the amount of $25,000; and if so, he wanted available and ready a fund of that amount withdrawable from his family trust to meet the obligation to restore the trust fund. But this is very far removed from the plaintiff's contention that the release of the stock by The Real Estate Trust Company as trustee, upon the cancellation of the note held by Burnett, amounted to a purchase by Burnett of the stock for the trust account. While the amount of stock so contemporaneously released was roughly equivalent to the amount purchased for $25,000 at the original cost price per share, the value of the stock had then very greatly increased and was worth many times $25,000. If there had been any evidence that the $25,000 in the trust fund had been originally applied for the acquisition of the stock, it might be possible to hold that the stock was constructively impressed with a trust for the benefit of the fund. But there is no such evidence, and therefore the most that the plaintiff can possibly make out of this circumstance is that Burnett was conscious of his obligation to restore the $25,000 to the trust fund and intended to hold the stock as security to repair the breach of trust to the extent of $25,000. On this hypothesis, it would be possible to hold the trust fund entitled to a lien on the life insurance stock. But this becomes immaterial in view of the defendant's admitted entire solvency and readiness now to turn over $25,000 as a part of the corpus of the trust fund. It is also possible to suspect that even now a full and frank disclosure has not been made by the defendant with respect to the relation of this note to the trust fund. But the court would not be warranted in basing a decree for the plaintiff merely upon suspicion, in the absence of proof either affirmative or fairly presumptive, which is wholly lacking in this case.

3. *As to the Socony Vacuum Stock.* Counsel for the defendant strongly argue that the market loss in this stock should impose no liability on the trustee, because it was, at the time of its purchase, a highly rated stable stock; and that there is no absolute rule relating to investment of trust funds which prohibits the investment in stocks as contrasted with other securities. The argument is plausible and intrinsically sound in itself, and I would adopt it if it were the only criticism regarding the management of the trust fund. But the circumstances of the case as a whole, as well as those relating to the particular purchase, are quite out of the ordinary. It is to be borne in mind that the purchase was not made for the purpose of investing idle funds in the estate. Outside of the $25,000 item all the cash funds had previously been invested in good bonds. The Socony Vacuum stock at a cost price of over $6,000 was apparently bought on margin in the name of the defendant individually, and long held in the brokers' names, although the defendant says he kept it in the trust box and paid the dividends thereon to the life tenant. It appears that some of the bonds were pledged with the brokers as collateral for the margin account. Ultimately the proceeds of most of the bonds were, over a period of years, paid on account of the purchase price for the stock. It has subsequently declined greatly in market value. In these circumstances and others appearing in the case already mentioned, the purchase of this stock cannot fairly be regarded as a reasonably prudent investment by the trustee. The conclusion is necessary that the defendant must be held liable for its original purchase price and be allowed to retain the stock for himself.

4. *As to the unsold U. S. F. & G. Co. Stock.* Counsel for the plaintiff argue that the stock should have been sold at the high market price prevailing when the other 75 shares were sold; and that when the defendant permitted the original 5 shares and the securities substituted therefor to be put in his own individual name and so retained, that constituted a conversion of the stock by him which makes him

personally liable for the then prevailing market price. Brown v. Tydings, 149 Md. 22, 130 A. 337; Mitchell v. Moore, 95 U.S. 587, 24 L.Ed. 492; 106 A.L.R. p. 272, sub. II. But these cited cases do not sustain the proposition contended for under the present facts. The evidence is uncontradicted that putting the stock in the individual name of the defendant was inadvertent rather than intentional; that the stock certificates have been constantly kept in the trust box; and that no personal use was made of them by the defendant. The conversion therefore was at most only a technical breach of trust causing no loss to the estate. The stock is now of approximately the same value as its original cost. There is an obvious difference between the facts of the instant case and one where the trustee deposits the trust moneys in his own name in a bank that fails. See Carey v. Safe Deposit & Tr. Co., 168 Md. 501, 512, 178 A. 242. The order of court authorizing the sale of the stock did not in terms mandatorily require it to be sold. The retention by the trustee of this comparatively small amount of the whole investment in U. S. F. & G. Co. stock was not an unreasonable exercise of discretion and judgment by the fiduciary. The income from the stock was regularly paid over to the life tenant. As to this item I conclude that the defendant has no liability beyond delivering the certificates therefor as a part of the corpus of the trust fund, and any accumulated and unpaid dividends thereon.

5. Counsel for the plaintiff make the further contention that the defendant should be held liable for compound interest accruing during the life of the life tenant, over and above the simple income paid to her, and also for compound interest on the fund accumulating since the death of the life tenant. I conclude that there is no justification for this contention. The uncontradicted testimony is that the whole income on the fund was currently paid to the life tenant. It is true that after her death the defendant first took the position that the corpus of the fund was only $7,800, and for some time failed to make a full disclosure regarding the trust fund; but with reasonable promptness after suit was brought he has accepted his proper liability for the $25,000 in issue and has tendered himself ready to account for the principal of the corpus of the fund. In the circumstances I think he should be required to pay only simple interest at 6% on the cash corpus of the fund and the current income on the bond and stock in the trust.

Counsel may submit an appropriate decree in due course. Taxable court costs. must be paid by the defendant, including the stenographer's per diem, as the testimony has not been transcribed.